UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re DOMINO'S PIZZA INC. | MASTER FILE: 16 Civ. 2492 (AJN)(KNF) |
| THIS DOCUMENT RELATES TO:<br><br>RIAD KUCHER, HAROON MOJUMDER and OMAR FARUK, on behalf of themselves and all other similarly-situated employees,<br><br>Plaintiffs,<br><br>v.<br><br>DOMINO'S PIZZA, INC., *et al.*,<br><br>Defendants. | Case No. 16 Civ. 02492 (AJN)(KNF) |
| MARCELO DE LOS SANTOS, SANDRO MAYORAL-CLINICO, AARON CRUZ AGUACATITLA, and MOUNI YAMBA, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HAT TRICK PIZZA, INC. d/b/a/ Domino's Pizza, *et al.*<br><br>Defendants. | Case No. 16 Civ. 06274 (AJN)(KNF) |

## MEMORANDUM OF LAW IN SUPPORT OF THE DOMINO'S DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**DLA PIPER LLP (US)**
Norman M. Leon
Joseph A. Piesco, Jr.
Garrett D. Kennedy
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Tel.:   (212) 335-4500
Fax:   (212) 335-4501

*Attorneys for Defendants Domino's Pizza, Inc., Domino's Pizza LLC and Domino's Pizza Franchising LLC*

## <u>TABLE OF CONTENTS</u>

I.  PRELIMINARY STATEMENT ................................................................... 1

  A.  The Parties And The Plaintiffs' Allegations .................................. 4

  B.  The Domino's Defendants ............................................................. 5

  C.  Franchisors Are Required To Exercise
      Control Over Their Franchisees' Operations ................................ 6

  D.  While DPF Takes Steps To Enforce Its Standards
      And Protect Its Brand, It Has No Control Over Labor
      Matters At The Cookston Defendants' Stores ............................... 7

III.  PROCEDURAL BACKGROUND ........................................................ 10

IV.  LEGAL ARGUMENT ......................................................................... 10

  A.  The Applicable Standards ........................................................... 10

    1.  Summary Judgment Standard ............................................... 10

  B.  Plaintiffs Have Made No Effort To Show Which
       Domino's Defendant Engaged In Which Alleged Action ......... 12

  C.  Plaintiffs Can Present Nothing That Justifies Departing
      From The Settled Principle That Franchisors Are Not
      The Joint Employers Of Their Franchisees' Employees ............ 13

    1.  DPF Did Not Exercise "Formal Control" Over The Cookston Defendants'
        Employees .......................................................................... 15

      i.  DPF Played No Role in Hiring or Firing Decisions ..................... 16

      ii.  The Domino's Defendants Never Exercised Control
          Over Plaintiffs' Work Schedules or Conditions of Employment ................ 18

      iii.  The Domino's Defendants Do Not Determine How
          Or What the Cookston Defendants' Employees Are Paid .......................... 20

      iv.  The Domino's Defendants Do Not Maintain
          Plaintiffs' Employment Records ..................................... 21

    2.  The Domino's Defendants Did Not Exercise  "Functional Control" Over The
        Cookston Defendants' Employees ...................................... 22

      i.  Plaintiffs Never Used The Domino's
          Defendants' Premises Or Equipment ........................... 22

      ii.  There Was No Shift Of Employees To
          The Domino's Defendants ............................................ 22

      iii.  Plaintiffs Never Performed Functions Integral
          To The Domino's Defendants' Process of Production ................ 22

iv.  Plaintiffs Cannot Pass From One "Subcontractor" To Another ................... 23

v.  The Domino's Defendants Did Not  Supervise
The Cookston Defendants' Employees ....................................................... 23

vi.  The Cookston Defendants' Employees
Never Performed Work for the Domino's Defendants ............................... 24

D.  Plaintiffs' Supposed Belief that "Domino's" Was
Their Employer Is Irrelevant And Belied By The Record ........................................ 24

V.   CONCLUSION .............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Allende v. PS Brother Gourmet, Inc.*,
   2013 WL 11327098 (S.D.N.Y. Feb. 1, 2013) (Nathan, J.) ...............................................11, 12

*Barfield v. N.Y.C. Health and Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008)...........................................................................................12

*Carter v. Dutchess Cmty. Coll.*,
   735 F.2d 8 (2d Cir. 1984).........................................................................................*passim*

*Cavallaro v. UMass Memorial Health Care, Inc.*,
   971 F. Supp. 2d 139 (D. Mass. 2013) ............................................................................13

*Chen v. Domino's Pizza, Inc.*,
   No. 09-CV-107, 2009 WL 3379946 (D.N.J. Oct. 16, 2009) ...........................................15

*Chen v. Street Beat Sportswear, Inc.*,
   364 F. Supp. 2d 269 (E.D.N.Y. 2005) ............................................................................19

*Courtland v. GCEP-Surprise, LLC*,
   2013 WL 3894981 (D. Ariz. July 29, 2013) ...................................................................15

*Donovan v. Breaker of Am., Inc.*,
   566 F. Supp. 1016 (E.D. Ark. 1983) ..............................................................................15

*E.E.O.C. v. Am. Laser Ctrs. LLC*,
   2010 WL 3220316 (E.D. Cal. Aug. 13, 2010) ................................................................13

*Freeney v. Bank of Am. Corp.*,
   2015 WL 4366439 (C.D. Cal. July 16, 2015) .................................................................13

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
   22 F.3d 1219 (2d Cir. 1994)...........................................................................................11

*Gessele v. Jack in the Box*,
   2016 WL 7223324 (D. Or. Dec. 13, 2016) .....................................................................15

*Godlewska v. HDA*,
   916 F. Supp. 2d 246 (E.D.N.Y. 2013) .......................................................................21, 22

*Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*,
   874 F.2d 431 (7th Cir. 1989) ...........................................................................................7

*Hatcher v. Augustus*,
   956 F. Supp. 387 (E.D.N.Y. 1987) .................................................................................15

*Herman v. RSR Sec. Servs. Ltd.*,
   172 F.3d 132 (2d Cir. 1999).................................................................20

*Hugee v. SJC Grp., Inc.*,
   2013 WL 4399226 (S.D.N.Y. Aug. 14, 2013) ..............................19, 23

*In re Convenient Food Mart, Inc.*,
   1990 WL 51228 (N.D. Ill. Apr. 9, 1990) ...........................................25

*In re Ovadia*,
   19 N.Y.3d 138 (2012) .......................................................................23

*Jacobson v. Comcast Corp.*,
   740 F. Supp. 2d 683 (D. Md. 2010) ..................................................17

*Jaramillo v. Weyerhaeuser Co.*,
   536 F.3d 140 (2d Cir. 2008)...............................................................11

*Jean-Louis v. Metro. Cable Comms., Inc.*,
   838 F. Supp. 2d 111 (S.D.N.Y. 2011).......................................... *passim*

*Knight v. U.S. Fire Ins. Co.*,
   804 F.2d 9 (2d Cir. 1986)...................................................................11

*Lawrence v. Adderley Indus., Inc.*,
   2011 WL 666304 (E.D.N.Y. Feb. 11, 2011)..................................17, 18

*Lovett v. SJZC Fulton IND I, LLC*,
   2016 WL 4425363 (N.D. Ga. Aug. 22, 2016) ...................................15

*Martin v. Purolator Courier*,
   1996 WL 429016 (E.D.N.Y. July 25, 1996) ......................................25

*Martin v. Sprint United Mgmt. Co.*,
   2017 WL 4326109 (S.D.N.Y. Sept. 27, 2017)..........................17, 20, 21

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).............................................................................11

*Nakahata v. N.Y. Presbyterian Healthcare Sys., Inc.*,
   2011 WL 321186 (S.D.N.Y. Jan. 28, 2011), *aff'd in part, vacated in part on other
   grounds, and remanded*, 723 F.3d 192 (2d Cir. 2013) ........................13

*Orozco v. Plackis*,
   757 F.3d 445 (5th Cir. 2014) .............................................................15

*Patterson v. Domino's Pizza, LLC*,
   333 P.3d 723 (Cal. 2014) .......................................................... *passim*

*Reese v. Coastal Restoration & Cleaning Svcs., Inc.*,
    2010 WL 5184841 (S.D. Miss. Dec. 15, 2010) ................................................15, 17

*Ridinger v. Dow Jones & Co., Inc.*,
    651 F.3d 309 (2d Cir. 2011) .............................................................................11

*Singh v. 7–Eleven Inc.*,
    2007 WL 715488 (N.D. Cal. Mar. 8, 2007) .........................................................15

*Susser v. Carvel Corp.*,
    206 F. Supp. 636 (S.D.N.Y. 1962),
    *aff'd,* 332 F.2d 505 (2d Cir. 1964) ....................................................................7

*Vann v. Massage Envy Franchising LLC*,
    2015 WL 74139 (S.D. Cal. Jan. 6, 2015) .............................................................15

*Zheng v. Liberty Apparel Co.*,
    355 F.3d 61 (2d Cir. 2003) .......................................................................... *passim*

### STATUTES AND OTHER AUTHORITIES

N.Y. Gen. Bus. Law § 681 ....................................................................... *passim*

16 C.F.R. §436.1 ...............................................................................2, 6, 7

Fed. R. Civ. P. 56 ................................................................................ *passim*

Defendants Domino's Pizza, Inc. ("DPI"), Domino's Pizza Franchising LLC ("DPF"), and Domino's Pizza LLC ("DPL") (collectively, the "Domino's Defendants") respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment with respect to the claims asserted by the Plaintiffs[1] in the consolidated actions *Kucher, et al. v. Domino's Pizza, Inc., et al.*, 16 Civ. 2492 (AJN) (KNF) ("*Kucher*"), and *De Los Santos, et al. v. Hat Trick Pizza, Inc., et al.*, 16 Civ. 6274 (AJN) (KNF) ("*De Los Santos*"), seeking to hold the Domino's Defendants liable as "joint employers" for the alleged wage and hour violations by the defendant franchisees and their owner, Robert Cookston (collectively, the "Cookston Defendants").

## I.    PRELIMINARY STATEMENT

The Plaintiffs' contention that the "Domino's Defendants" are "joint employers" of the Cookston Defendants' employees has no legal or factual support in the record.  According to Plaintiffs, DPI and two of its affiliates (which the Plaintiffs simply refer to collectively as "Domino's") should each be held liable as a "joint employer" for the labor law violations allegedly committed by the Cookston Defendants because the Domino's Defendants supposedly exercise control over the working conditions of the Cookson Defendants' employees.  This control, the Plaintiffs allege, manifests itself through "Domino's" implementation and enforcement of standards that were developed by DPF and its franchisees to protect the Domino's brand and to maintain quality and consistency for customers.  That argument simply ignores the fundamental nature of the relationships at issue in this proceeding and settled precedent.[2]

---

[1]      As used herein, "Plaintiffs" shall refer collectively to *Kucher* plaintiffs Riad Kucher, Haroon Mojumder and Omar Faruk, who assert claims on their own behalf and seek to represent a putative class of purportedly similarly situated persons, opt-in plaintiffs Amanul Boby and Sakhayat Hossain, and *De Los Santos* plaintiffs Marcelo De Los Santos, Sandro Mayoral-Clinico, Aaron Cruz Aguacatitla and Mouni Yamba.

[2]      As set forth in § IV.B, *infra*, there is no basis for Plaintiffs' claim that DPI or DPL – two corporate entities without any relationship to the Cookston Defendants – are joint employers of the Cookston Defendants' employees.

The "controls" that Plaintiffs contend are indicia of an employment relationship (*e.g.*, implementation of, enforcement of, and monitoring compliance with brand standards) are fundamental features of every franchise system.   Indeed, the Federal Trade Commission ("FTC"), which regulates the sale of franchises, defines a "franchise" as a commercial relationship in which the franchisor "exert[s] or has the authority to exert a significant degree of control over the franchisee's method of operation . . . ."   16 C.F.R. § 436.1(h)(2).   That, no doubt, is why (to the Domino's Defendants' knowledge) every court that has reached the merits of the "joint employer" issue has concluded that the same controls Plaintiffs point to here do **not** transform a franchisor into a joint employer of its franchisees' employees.   This includes the California Supreme Court, which recently held (in *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723 (Cal. 2014)) that the Domino's Defendants were not joint employers of their franchisees' employees **as a matter of law**.

The California Supreme Court's ruling hardly broke new ground.   In addition to the multitude of courts that have come to the same conclusion in franchise cases, the ruling is in accord with the holdings of the New York Court of Appeals and the Second Circuit, both of which have expressly rejected any application of the law that converts normal, well-established contractual relationships (like those between franchisors and franchisees) into employment relationships.   Both Courts have also made clear that a party's efforts to ensure quality and consistency by its contractual counterparty does not transform the former into a joint employer of the latter's employees.

An analysis of the factors that courts have considered in assessing joint employment claims (the "economic reality test") likewise compels the rejection of Plaintiffs' contention. Cases interpreting the Fair Labor Standards Act ("FLSA") and the New York Labor Law

("NYLL") require that Plaintiffs prove that "Domino's" actually hired, fired, disciplined, controlled the working conditions of, paid, and maintained the employment records of the putative employees.  Suffice it to say, there is no competent record evidence that "Domino's" engaged in any of these actions as to any of the Cookston Defendants' employees.  Mr. Cookston (who is the managing member or controlling shareholder of each franchisee) testified that he and his supervisors and managers (not "Domino's") (i) do all of the hiring and firing at their stores; (ii) determine how much to pay their employees; (iii) determine how and when to discipline their employees; and (iv) determine their employees' work schedules.  In fact, consistent with the terms of the parties' franchise agreements – which make clear that the franchisee is "solely responsible for recruiting, hiring, training, scheduling for work, supervising and paying the persons who work in the Store" – Mr. Cookston testified that "Domino's" has absolutely nothing to do with his labor relations.  Hundreds of putative class and collective action members signed Declarations confirming these same undisputed facts.

Plaintiffs will present nothing that overcomes this overwhelming (and, indeed, indisputable) evidence – because nothing exists.  Instead, after forcing the Domino's Defendants to expend vast resources defending claims that should never have been brought, all Plaintiffs will be able to cobble together in opposition to this Motion are (i) a few scattered instances – most of which lie outside the applicable limitations period – in which employees of the Cookston Defendants decided to relay to "Domino's" information about their handling of employee and/or operational matters; (ii) the fact that "Domino's" requires franchisees to conduct criminal background and motor vehicle checks, conducts random store inspections (generally three times a year), and requires that franchisees comply with certain brand-related requirements (such as being open during certain hours and having at least two people present in a store); and (iii) the

Plaintiffs' own subjective (and entirely irrelevant) belief that "Domino's" was their employer because the Domino's® logo was used by the Cookston Defendants on certain internal documents (which were never reviewed or approved by "Domino's") and appears throughout the stores in which they worked – a claim that is contradicted not only by Plaintiffs' own Complaints, but by Declarations they submitted to this Court.   None of these allegations constitute evidence that "Domino's" ever exercised control over the working conditions of any Plaintiff.   More importantly, the law makes clear that allegations such as these – even if true – are not sufficient to make a party a joint employer.

Based on the foregoing, and the arguments presented below, no reasonable jury could conclude that the Domino's Defendants are "joint employers" of the Cookston Defendants' employees.   Therefore, the Domino's Defendants submit that summary judgment should be entered in their favor, and against Plaintiffs, on all claims in their respective Complaints.

## II.   STATEMENT OF UNDISPUTED FACTS[3]

### A.  The Parties And The Plaintiffs' Allegations

Domino's® is one of the largest and most well-established franchise systems in the world.   For more than 50 years, the Domino's brand has been synonymous with the timely delivery of quality, affordable pizza.   (R. 56.1, ¶ 7.)   There are currently more than 5,500 Domino's stores in the United States, approximately 5,100 of which are franchised to and owned and operated by independent business owners.   (*Id.*)   Defendant Robert Cookston, through 33 different corporate entities, owns and operates 32 of those franchised Domino's stores.   (*Id.*, ¶ 8.)

---

[3]     The Domino's Defendants incorporate by reference herein their Statement of Undisputed Facts ("R. 56.1"), which has been submitted in accordance with Fed. R. Civ. P. 56 and Local Rule 56.1.

The Plaintiffs are current and/or former employees of a few of Mr. Cookston's franchised stores.  Specifically, aside from Plaintiff Riad Kucher (who had relatively brief stints working at five of Mr. Cookston's Domino's stores), the *Kucher* Plaintiffs all worked at a single store, located at 205 Allen Street in New York, which store is owned by a franchise entity named 3694 Lower East Side Pizza, LLC.  (R. 56.1, ¶¶ 1-2.)  The *De Los Santos* Plaintiffs all worked at the store located at 227 W. 40th Street in New York, which is owned and operated by a franchise entity named Hat Trick Pizza, Inc.  (*Id.*, ¶¶ 1, 3.)

Plaintiffs claim, in substance, that the Cookston Defendants violated the NYLL and the FLSA by forcing them to work "off the clock," withholding gratuities, failing to give "spread of hours" pay and accurate wage statements, and making Plaintiffs purchase uniforms.  (*Kucher*, ECF No. 171 ¶¶ 88-119; *De Los Santos*, ECF No. 106, ¶¶ 1-4.)

## B. The Domino's Defendants

Plaintiffs concede that they were employed by Mr. Cookston or the entities which own and operate the franchises at which they previously worked.  (R. 56.1, ¶¶ 1-3.)  Plaintiffs also concede that any alleged wage and hour violations they experienced happened at the individual store level – *i.e.*, there is no claim (let alone evidence) that "Domino's" instructed any of the Cookston Defendants to violate any of their obligations to any of their employees.

Nonetheless, the Plaintiffs' allegations are not directed solely at the Cookston Defendants.  Rather, Plaintiffs have named three separate Domino's entities – DPF, DPL, and DPI – as defendants under the theory that each entity is a joint employer of each employee at each of the 32 different Domino's stores owned and operated by the 33 different entities that comprise the Cookston Defendants.  (*See* R. 56.1, ¶ 8.)

While Plaintiffs ignore the separateness of DPF, DPL and DPI, each entity is in fact separate.  DPI is a publicly traded company with its principal place of business in Ann Arbor,

Michigan.  (R. 56.1, ¶ 4.)  DPI is the indirect parent of DPL, which entity granted Domino's franchises until 2007.  (*Id*., ¶ 6.)  DPF, which is also an indirect subsidiary of DPI, is the entity that grants franchises to approved entities to own and operate Domino's stores.  (*Id*., ¶ 5.)

DPF, DPI and DPL are separate and distinct from the Cookston Defendants.  The entities have no common officers, directors, or employees.  (R. 56.1, ¶ 12.)  The Cookston Defendants maintain their own bank accounts, have separate ownership, and possess their own business licenses.  (*Id*., ¶ 11.)  The Cookston Defendants invest their own time and money in their stores, bear the risk of loss, and enjoy the profits derived from those businesses.  (*Id*., ¶ 10.)  The only "relationship" between the Cookston Defendants and the Domino's Defendants is the franchise relationship between DPF and the Cookston Defendants, which is embodied in the 32 written franchise agreements (the Standard Franchise Agreement or "SFA") that govern the 32 separate franchises that the Cookston Defendants own and operate.  (*Id*., ¶ 9.)

## C. Franchisors Are Required To Exercise Control Over Their Franchisees' Operations

The fact that franchise relationships underlie this suit is essential to understanding the relevance of the controls on which Plaintiffs' Complaints are premised.  In franchising, "[t]he goal – which benefits both parties to the contract – is to build and keep customer trust by ensuring consistency and uniformity in the quality of goods and services, the dress of franchise employees, and the design of the stores themselves."  *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723, 733 (Cal. 2014).  In fact, these concepts (uniformity and consistency) are built into the very definition of what a "franchise" is.

Both the FTC and New York (which both regulate the sale of franchises) define a "franchise" as a commercial relationship in which a franchisee offers or sells goods or services that are substantially associated with the franchisor's trademark.  *See* 16 C.F.R. §436.1(h)(1);

N.Y. Gen. Bus. Law § 681(3)(b).  Trademark law, in turn, **requires** that trademark owners maintain control over the use of their marks.  *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989).  As a result, to protect the value of their trademark, franchisors (as licensors) must exercise control over the standards franchisees implement in distributing goods or services under their marks.  *See Patterson*, 333 P.3d at 733.

In addition, both the FTC and New York law require that a franchisor exert significant control over a franchisee's methods of operation.  New York's Franchise Sales Act defines a "franchise" as a business arrangement under which the "franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services **under a marketing plan or system prescribed in substantial part by a franchisor** . . . ."  N.Y. Gen. Bus. Law § 681(3)(a) (emphasis added); *accord* 16 C.F.R. § 436.1(h)(2).  Notably, New York Attorney General's Investor Protection Bureau (charged with enforcing the Franchise Sales Act) specifically advises potential franchisees that they "will be expected to conform to rules designed to assure that the product or service which you deliver is of the same quality as those delivered by the chain's other franchisees.  Uniformity is very important to a franchise chain and you will be required to follow the rules."  (*See* Exhibit A to the Declaration of Joseph Devereaux, dated October 31, 2017.)  These "rules" foster the consistency that is the essence of franchising.  *Susser v. Carvel Corp.*, 206 F. Supp. 636, 640 (S.D.N.Y. 1962), *aff'd*, 332 F.2d 505 (2d Cir. 1964).

**D.  While DPF Takes Steps To Enforce Its Standards And Protect Its Brand, It Has No Control Over Labor Matters At The Cookston Defendants' Stores**

To maintain the quality control and uniformity that are the *sine qua non* of all franchised businesses, the Domino's Defendants (together with its franchisees) have established minimum standards that govern the operation of all Domino's stores.  (R. 56.1, ¶¶ 14-17.)  DPF seeks to enforce these standards by conducting occasional site visits and unannounced inspections called

Operations Evaluation Reports ("OER"), which generally are conducted three times a year. (*Id.*, ¶ 66.) Through these efforts, DPF seeks to build and maintain the value of its brand by ensuring that the products and services distributed under its marks are of consistent quality. (*Id.*, ¶ 67.)

Subject to their compliance with these brand standards, franchisees can operate their stores as they see fit. (R. 56.1, ¶ 17.) Franchisees decide how to implement DPF's standards, choose their store locations, lease their own premises, set their own prices (except for nationwide promotions), do their own local advertising, decide whether to charge delivery fees, and address directly any customer complaints. (*Id.*) Franchisees can also seek a variance from any standard. (*Id.*, ¶ 16.)

In addition, franchisees control all employment matters in their stores. (R. 56.1, ¶ 19.) The SFA provides that the Cookston Defendants are "solely responsible for recruiting, hiring, training, scheduling for work, supervising and paying the persons who work in the Store and those persons shall be your employees, and not our agents or employees." (*Id.*) The SFA further states that the franchisee is an independent contractor and that "neither [the franchisor] nor [its] affiliates have any relationship with [the franchisee's] employees and . . . have no rights, duties, or responsibilities with regard to their employment by [the franchisee]." (*Id.*) Franchisees agree that it is their obligation (not DPF's) to take all steps necessary to operate their stores "in full compliance with all applicable laws, ordinances and regulations." (*Id.*, ¶ 20.)

The evidence shows that these provisions are entirely consistent with the way the Cookston Defendants actually run their stores. Both Mr. Cookston and the Director of Operations over all of the Cookston Defendants' stores, Louis O'Neill, were deposed in these actions. Both made clear that they determine who to hire (R. 56.1, ¶¶ 21-23), that they decide who to fire (*id.*, ¶¶ 28-30), that they set the schedules at their stores (*id.*, ¶¶ 42-45), that they

determine the wages of their employees (*id.*, ¶ 75), that they train their stores' employees (*id.*, ¶¶ 57-61), that they create their own employment policies (*id.*, ¶¶ 62-63), that they determine whether discipline is warranted (*id.*, ¶¶ 53-55), and that their management team is "**solely responsible for all employment matters**" at their stores (*id.*, ¶ 38 [emphasis added].)[4]

The testimony of the Plaintiffs underscores this testimony and lays bare the fact that Plaintiffs have no basis for claiming that DPF (or any other Domino's Defendant) is their employer.  For example, Plaintiff Haroon Mojumder testified that he has never spoken to any employee of the Domino's Defendants (R. 56.1, ¶ 40), that he has no idea why any of the Domino's Defendants were named as Defendants in this suit (*id.*, ¶ 41), and that no one other than his store's managers ever told him what to do (*id.*).  Plaintiff Omar Faruk testified that he interacted with an employee of the Domino's Defendants on only one occasion (during a store inspection), and that the full extent of his interaction with that inspector consisted of him saying "Welcome to Domino's."  (*Id.*, ¶ 40.)  Plaintiff Amanul Boby likewise testified that he has never spoken to any employee of any of the Domino's Defendants, has no idea what sort of business the various Domino's Defendants are engaged in, and only believes that the Domino's Defendants should be liable for the Cookston Defendants' alleged wage violations because all Domino's stores make pizzas and because the Domino's Defendants purportedly did not "make sure" that the Cookston Defendants were properly paying their employees.  (*Id.*, ¶ 41.)

Plaintiffs' experiences are hardly the exception.  Over 200 employees of the Cookston Defendants signed Declarations attesting to the fact that (i) they never met with or spoke to

---

[4]  Plaintiffs will no doubt claim that, in an affidavit Mr. Cookston signed to resolve certain allegations that the New York Attorney General's office asserted against him based on his pay practices, he claimed that "Domino's" exercised certain controls over his employment practices.  As shown below, those alleged controls (i) are not relevant to this proceeding, as they largely relate to Mr. Cookston's former use of "Domino's" proprietary point-of-sale system ("PULSE"), which Mr. Cookston ceased using for any function other than customer order processing in 2009, and (ii) relate to requirements – such as the requirement that franchisees run criminal background checks – that the courts have repeatedly made clear are not indicia of a joint employment relationship.

anyone from "Domino's" in connection with their hiring, (ii) the only people who supervise them are employees of the Cookston Defendants, (iii) their supervisors (not "Domino's") set their wages, and (iv) to their knowledge, "Domino's" has had no involvement in any aspect of their employment with the Cookston Defendants.  (R. 56.1, ¶¶ 23, 37-38, 75-76.)

### III.      PROCEDURAL BACKGROUND

On April 5, 2016, the *Kucher* Plaintiffs filed a putative class action (*Kucher*, ECF No. 1) claiming that the Domino's Defendants were their employers and liable for all of the alleged violations they claim the Cookston Defendants committed over the past six years.  The operative complaint, which is Plaintiffs' Third Amended Complaint, was filed on August 26, 2016.  (*Id.*, ECF No.171.)  On June 16, 2016, the Domino's Defendants moved to bifurcate proceedings to allow the Court to address the viability of Plaintiffs' joint employer theory before the parties engaged in merits discovery.  (*Id.*, ECF No. 138.)  That motion was granted on July 15, 2016. (*See Id.*, ECF Nos. 153, 162.)

On August 8, 2016, the *De Los Santos* Plaintiffs filed their Complaint, seeking to represent the same putative class as in *Kucher*.  (*De Los Santos*, ECF No. 1.)  Following motion practice, the *De Los Santos* Plaintiffs withdrew their class claims and filed an amended Complaint.  (*Id.*, ECF No. 106.)  That action was consolidated with *Kucher*.  (*Kucher*, ECF No. 211.)  Discovery concluded on September 29, 2017.  (*Kucher*, ECF No. 204.)

### IV.      LEGAL ARGUMENT

#### A.  **The Applicable Standards**

##### 1.      **Summary Judgment Standard**

Under Rule 56, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, "all ambiguities must be resolved and all

inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). However, a party must "do more than simply show that there is some metaphysical doubt as to the material facts" to overcome a properly supported motion for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a party must come forward "with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[M]ere speculation or conjecture as to the true nature of the facts" is not enough (*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)), and "conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *Ridinger v. Dow Jones & Co., Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted).

## 2.    The Joint Employer Analysis

"To be liable under the FLSA or NYLL, a person must be an employer." *Allende v. PS Brother Gourmet, Inc.*, No. 11 Civ. 5427 (AJN) (KNF), 2013 WL 11327098, at *2 (S.D.N.Y. Feb. 1, 2013) (Nathan, J.). Because "[t]he definition of 'employer' under these statutes is co-extensive," "courts employ a single test to determine whether an individual qualifies as an employer under the FLSA and NYLL." *Id.*

To determine whether an employment relationship exists, courts "evaluate the 'economic reality' of the [parties'] relationship." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). "In view of this 'economic reality' approach, the Second Circuit has established a non-exhaustive multi-factor test for determining whether an entity or individual is an employer." *Allende*, 2013 WL 11327098, at *3. That test entails consideration of four "formal control" factors, *see Carter*, 735 F.2d at 12, and various "functional control" factors, *see Zheng v. Liberty*

*Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003), which may have differing applicability "based on the factual challenges posed by particular cases." *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008).

The "formal control" factors consider "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Carter*, 735 F.2d at 12. "Functional control" examines

> (1) whether [the joint employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [direct employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the joint employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [the joint employer] supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [the joint employer].

*Zheng*, 355 F.3d at 72.

The "overarching concern" in applying these factors "is whether the alleged employer possessed the power to control the workers in question." *Allende*, 2013 WL 11327098, at *3 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

**B. Plaintiffs Have Made No Effort To Show Which
   <u>Domino's Defendant Engaged In Which Alleged Action</u>**

As shown below, consideration of the formal and functional control factors proves conclusively that the Domino's Defendants do not control the Cookston Defendants' employees. But Plaintiffs' claims fail for a more fundamental reason: namely, Plaintiffs have not even attempted to show why any particular Domino's Defendant should be deemed a joint employer.

"The regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the same time." *Zheng*, 355 F.3d at 66. However, merely alleging that entities are joint employers is not sufficient; "a plaintiff seeking to hold multiple

entities liable as joint employers must plead specific facts that explain how the defendants are related **and how the conduct underlying the claims is attributable to each**." *Freeney v. Bank of Am. Corp.*, 2015 WL 4366439, at *18 (C.D. Cal. July 16, 2015) (emphasis added); *accord E.E.O.C. v. Am. Laser Ctrs. LLC*, 2010 WL 3220316, at *5 (E.D. Cal. Aug. 13, 2010).

Plaintiffs can present nothing which demonstrates how any of the control factors apply to each of the individual Domino's Defendants – *i.e.*, **which** of the Domino's Defendants supposedly had the power to hire, **which** of the Domino's Defendants supposedly supervised or controlled working conditions (and how each entity did so), and **which** of the Domino's Defendants supposedly determined the employees' rates or methods of payment (and how it did so). Absent these most basic of allegations, summary judgment should be granted. *See*, *e.g.*, *Nakahata v. N.Y. Presbyterian Healthcare Sys., Inc.*, 2011 WL 321186, at *4 (S.D.N.Y. Jan. 28, 2011) (dismissing as "deficient" a complaint alleging violations of the FLSA and the NYLL because it "fail[ed] to specify which entity, among the many named defendants, employed the respective plaintiffs"), *aff'd in part, vacated in part on other grounds, and remanded*, 723 F.3d 192 (2d Cir. 2013); *Cavallaro v. UMass Memorial Health Care, Inc.*, 971 F. Supp. 2d 139, 151 (D. Mass. 2013).

## C.  Plaintiffs Can Present Nothing That Justifies Departing From The Settled Principle That Franchisors Are Not The Joint Employers Of Their Franchisees' Employees

While the Second Circuit has not yet had the opportunity to apply the formal or functional control factors in a franchise dispute, numerous courts have. In fact, in *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723 (Cal. 2014), the California Supreme Court addressed – and rejected as a matter of law – the very same allegations that underlie the claims in this case.

In *Patterson*, an employee of a Domino's franchisee who had been sexually harassed by the franchisee's assistant manager brought suit against the franchisee and the three Domino's

Defendants named in this suit for violations of California's Fair Employment and Housing Act ("FEHA").  Like the FLSA and NYLL, "the existence of 'an employment relationship'" is a prerequisite to a FEHA claim.  *Id*. at 499.  Therefore, to prevail, the plaintiff needed to establish that the Domino's Defendants were employers of the alleged harasser.  *Id*.  And as under the FLSA and NYLL, whether an entity is an "employer" under FEHA depends on whether the putative employer exercised authority over "matters such as hiring, firing, direction, supervision, and discipline of the employee."  *Id*.

Much like the Plaintiffs here, the *Patterson* plaintiff argued the Domino's Defendants were employers because they: (i) prescribed and enforced standards governing pizza-making, food safety, cleanliness, and customer complaints; (ii) provided an orientation program for new employees through the store's computer system on pizza-making, safety, and security; and (iii) set standards concerning attire, grooming, and hygiene and reviewed the franchisee's compliance with those standards.  *Patterson*, 333 P.3d at 484-86.  The *Patterson* plaintiff also argued that the Domino's Defendants were involved in the franchisee's employment decisions because they allegedly advised the franchisee to "get rid of" the assistant manager accused of harassment, suggested that certain employees may not be "right" for certain positions and, on other occasions, asked the franchisee to intervene if an employee was rude to a customer.  *Id*. at 485-86.

*Patterson* held that the Domino's Defendants were not employers of the franchisee's employee **as a matter of law**.  The court found that the franchise agreement (identical to those at issue here) made clear that workers in the franchisee's store were employees of the franchisee only, and that the Domino's Defendants had no right to hire, fire, train, supervise, schedule or determine the compensation of those employees.  *Patterson*, 333 P.3d at 500.  While the contract

language was "not dispositive," the court found that the factual record was consistent with that language.  *Id*. at 501.  The Domino's Defendants were not involved in "the application, interview, or hiring process" at the franchisee's store, did not monitor employee relations, and, though the Domino's Defendants allegedly told the franchisee to "get rid" of the harasser, they did not retain "the traditional right of general control an 'employer' or 'principal' has over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees." *Id*. at 503.

The *Patterson* decision is significant for at least two reasons.  First, it is squarely on point with the issue before this Court.  Second, it is consistent with well-settled law.  In fact, to the Domino's Defendants' knowledge, every court that has reached the merits of this issue has concluded that a franchisor is not the joint employer of its franchisees' employees **as a matter of law**.  *See, e.g.*, *Orozco v. Plackis*, 757 F.3d 445, 452 (5th Cir. 2014); *Chen v. Domino's Pizza, Inc.*, No. 09-CV-107, 2009 WL 3379946, at *3 (D.N.J. Oct. 16, 2009) ("[c]ourts have consistently held that the franchisor/franchisee relationship does not create an employment relationship between a franchisor and a franchisee's employees").[5]  There is nothing in this record that supports reaching a different result than all of these other courts.

### 1.     DPF Did Not Exercise "Formal Control" Over The Cookston Defendants' Employees

As set forth below, there is no evidence that the Domino's Defendants exercised "formal control" over the Cookston Defendant's employees and, accordingly, summary judgment should be granted in their favor.

---

[5]     *Accord Gessele v. Jack in the Box*, 2016 WL 7223324 (D. Or. Dec. 13, 2016); *Lovett v. SJZC Fulton IND I, LLC*, 2016 WL 4425363, at *16 (N.D. Ga. Aug. 22, 2016); *Vann v. Massage Envy Franchising LLC*, 2015 WL 74139, at *8 (S.D. Cal. Jan. 6, 2015); *Courtland v. GCEP-Surprise, LLC*, 2013 WL 3894981, at *10 (D. Ariz. July 29, 2013); *Singh v. 7–Eleven Inc.*, 2007 WL 715488, at *3-6 (N.D. Cal. Mar. 8, 2007); *Reese v. Coastal Restoration & Cleaning Svcs., Inc.*, 2010 WL 5184841, at *3-5 (S.D. Miss. Dec. 15, 2010); *Hatcher v. Augustus*, 956 F. Supp. 387, 393 (E.D.N.Y. 1987); *Donovan v. Breaker of Am., Inc.*, 566 F. Supp. 1016, 1019 (E.D. Ark. 1983).

### i.    *DPF Played No Role in Hiring or Firing Decisions*

The first formal control factor examines whether the alleged joint employer "has the power to hire" the direct employer's staff.  *Jean-Louis v. Metro. Cable Comms., Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011).  An alleged joint employer does not control hiring if, *inter alia*, it "does not receive applications . . . ; interview or review applicants; inform applicants that they have been hired; or provide new hires with employment forms."  *Id.*  Whether the putative joint employer "communicated with any [of the alleged joint employer's] employee prior to [their] being hired" is also relevant.  *Id.*

Consistent with the terms of the SFA (which makes clear that the hiring of employees is the sole province of a franchisee, *see* R. 56.1, ¶¶ 19), the evidence makes clear that DPF had no involvement with (let alone "control" over) the Cookston Defendants' hiring decisions.  Indeed, the record is undisputed that:

- The Plaintiffs all interviewed with and were hired by employees of the Cookston Defendants (R. 56.1, ¶¶ 21-25);
- Hundreds of other employees of the Cookston Defendants averred that they applied for jobs directly with, and were hired by, the Cookston Defendants (*id.*, ¶¶ 23, 25);
- All hiring decisions were made by the Cookston Defendants (*id.*, ¶ 22); and
- The Cookston Defendants post job advertisements without seeking approval from the Domino's Defendants (*id.*, ¶ 26).[6]

Because there is no evidence that the Domino's Defendants ever controlled the hiring of a single employee, Plaintiffs will likely attempt to argue that the Domino's Defendants exercise control over the hiring process because the SFA requires franchisees to conduct criminal background and motor vehicle history checks.  (*See, e.g.,* R. 56.1, ¶ 33.)  That argument has no merit, either factually or legally.   First, these checks are (i) conducted by the Cookston

---

[6]    The Cookston Defendants also control the promotion of their employees.  (*See* R.56.1, ¶ 32.)

Defendants; (ii) reviewed and analyzed by their personnel only; and (iii) not even provided to the Domino's Defendants.  (*Id.*, ¶¶ 33-36.)  More importantly, the ultimate hiring decision rests with the Cookston Defendants – regardless of the results of these checks.  (*Id.*, ¶¶ 34-35.)  To that end, no one at "Domino's" ever told the Cookston Defendants that they could not hire someone because of the results of these searches.  (*Id.*, ¶ 36.)  Second, the cases have consistently held that requiring criminal background checks (which are intended to protect a franchisor's brand) does not constitute evidence of "control" over hiring practices.  *See, e.g., Martin v. Sprint United Mgmt. Co.*, 2017 WL 4326109, at *14 (S.D.N.Y. Sept. 27, 2017) (background check was "quality control" issue).[7]

Similarly, there is no evidence that the Domino's Defendants played any role in the firing of any of the Cookston Defendants' employees.  To the contrary, the record is clear that the Cookston Defendants make termination decisions without oversight or approval from the Domino's Defendants.  (*See, e.g.,* R. 56.1, ¶ 28.)  Notably, two Plaintiffs testified that they were fired by, and each other *Kucher* Plaintiff averred that he resigned to, his manager, an employee of the Cookston Defendants, and not an employee of "Domino's."  (*See id.*, ¶¶ 29-30.)[8]

---

[7]     *Accord Jean-Louis*, 838 F. Supp. 2d at 123 (same); *Lawrence v. Adderley Indus., Inc.*, 2011 WL 666304, at *8 (E.D.N.Y. Feb. 11, 2011) (requiring drug testing and background checks was "good business sense," not evidence of joint employment); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 686-87 (D. Md. 2010) (same); *Reese v. Coastal Restoration & Cleaning Svcs., Inc.*, 2010 WL 5184841, at *4 (S.D. Miss. Dec. 15, 2010) (same).

[8]     While there are a few instances (about three or four times over seven years) in which either Mr. Cookston or one of his supervisors chose to advise a "Domino's" employee about one of their employment decisions, there is no evidence that the Domino's Defendants asked to be advised about these decisions, which were simply communicated in an effort to advise the Domino's Defendants of steps the Cookston Defendants decided to take to address a particular store's failure to comply with Domino's operational requirements.  (*See, e.g.,* R.56.1, ¶ 31.) There is no evidence that "Domino's" ever instructed or required the Cookston Defendants to fire a particular employee, let alone made the decision to fire one of their employees (which they were powerless to do).  (*Id.*)

ii.   **The Domino's Defendants Never Exercised Control Over Plaintiffs' Work Schedules or Conditions of Employment**

The second *Carter* factor examines whether the alleged joint employer "supervised and controlled employee work schedules or conditions of employment."  *Carter*, 735 F.2d at 12. Accordingly, supervision – even if extensive – "weighs in favor of joint employment **only** if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Zheng*, 355 F.3d at 74-5 (emphasis added); *see also Lawrence,* 2011 WL 666304, at *9 (maintaining "specific standards" to which employees must adhere does not constitute control over the terms and conditions of employment).

There is simply no evidence in this case which supports the allegation that the Domino's Defendants exercised control over scheduling or the terms and conditions of Plaintiffs' employment.  In fact, it is undisputed that:

- Mr. Cookston's supervisors and store managers supervised each store's employees on a day-to-day basis.  (*See* R. 56.1, ¶¶ 37-39.)  This was confirmed by the Plaintiffs' testimony and by hundreds of other employees.  (*See id.*)

- The schedules for employees of the Cookston Defendants are set by the Cookston Defendants only.  (*See id.*, ¶¶ 42-43.)  In fact, the Plaintiffs testified that their weekly work schedules, and the number of hours they worked, were set by their respective managers.  (*Id.*)[9]

- Complaints by employees of the Cookston Defendants about workplace issues are investigated and resolved by the Cookston Defendants.  (*Id.*, ¶¶ 46-51.)

- The Cookston Defendants are solely responsible for disciplining their employees, which discipline is meted out by a store's General Manager, its Supervisor, or Mr. O'Neill, as appropriate.  (*Id.*, ¶ 53.)  The Domino's Defendants are not involved in

---

[9]   While franchisees are required to have both a driver and an in-store employee on-shift when a store is open, this is not evidence of "control"; it is a basic quality standard (*i.e.*, the brand is negatively impacted if no one is available to prepare or deliver pizzas).  (R. 56.1, ¶ 45.)  As one court explained, control that "stem[s] from the nature of the business and the need to provide reliable service and convenience to the consumers, not [from] the nature of the relationship between [the direct employer] and [alleged joint employer]," does not evidence a joint employer relationship.  *Lawrence*, 2011 WL 666304, at *8 (*quoting Herman*, 164 F. Supp. 2d at 674).

this process.  (*Id.*, ¶ 54.)[10]

- The Cookston Defendants are solely responsible for training their employees, both in practice and under the SFA.  (*See id.*, ¶¶ 57-61.)  For instance, the *Kucher* Plaintiffs testified that they received training from managers who work for the Cookston Defendants, not from the Domino's Defendants.  (*See id.*, ¶ 58.)

- The Cookston Defendants developed their own handbooks, job applications and other employment documents and agreements, which are distributed and enforced by the Cookston Defendants' managerial staff.  (*See id.*, ¶ 62.)  These policies were prepared and put in place without approval from the Domino's Defendants.  (*Id.*, ¶¶ 62-63.)

Rather than present any evidence which shows that the Domino's Defendants actually controlled scheduling or the conditions of Plaintiffs' employment, Plaintiffs will likely claim that such control exists by virtue of the periodic, random OERs which are conducted to enforce compliance with DPF's brand standards.  (*See* R. 56.1, ¶ 67.)  That assertion simply misses the mark.  First, OERs occur only two or three times per year, per store, and could last just 30 to 40 minutes.  (*See id.*, ¶¶ 66, 67.)  During an OER, the inspector reviews the store's operations with the on-duty manager and has limited (if any) contact with the Cookston Defendants' non-managerial staff.  (*See id.*, ¶ 68.)  Second, these OERs – and any interactions that took place between an inspector and employees during the OER – are irrelevant to the joint employer inquiry.  Courts have uniformly held that:

> Taking measures to ensure quality control does **not** prove control over the conditions of employment.  Instead, quality control and compliance monitoring that stem from the 'nature of the business' – that is, from the nature of the goods or services being delivered – are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer.

*Hugee v. SJC Grp., Inc.*, 2013 WL 4399226, at *6 (S.D.N.Y. Aug. 14, 2013) (citations and quotations omitted); *see also Chen v. Street Beat Sportswear, Inc.,* 364 F. Supp. 2d 269, 286

---

[10]     While the Domino's Defendants maintain a "Customer Care" hotline and website – which is for *customers* – franchisee employees occasionally (albeit improperly) call with complaints about working conditions.  Such complaints are rerouted to franchisees to investigate and resolve on their own.  (R. 56.1, ¶ 55.)

(E.D.N.Y. 2005) ("[T]he Court will not consider evidence plaintiffs present with respect to this factor to the extent it concerns the presence of . . . quality control personnel.").[11]  This principle is especially applicable in the franchise context, as franchisors must strive to ensure that the products and services distributed under their marks are of consistent quality.  That, no doubt, is why **every** case addressing this issue on the merits has held that setting and enforcing operational standards does not transform a franchisor into a joint employer.  (*See* §§ II.C, IV.C, *supra*.)

### iii.    *The Domino's Defendants Do Not Determine How Or What the Cookston Defendants' Employees Are Paid*

The third control factor addresses whether the putative joint employer "determined the rate and method of payment." *Carter*, 735 F.2d at 12.  In analyzing this factor, "the key question is whether [the putative joint employer] had the authority to sign paychecks throughout the relevant [employment] period." *Herman*, 172 F.3d at 140.

Here, the evidence is undisputed: the Domino's Defendants had nothing to do with the wages of the employees of the Cookston Defendants.  (*See* R. 56.1, ¶¶ 71-84.)  As Mr. Cookston explained, no "Domino's" employee "ever told [him] what to pay any of [his] employees," and "[he] and [his] supervisors and managers have sole control over the setting of wages of [his] employees . . . ."  (*Id.*, ¶ 75.)  There also is no dispute that the Cookston Defendants pay and process their employees' paychecks, use their own accountant, issue W-2s and W-4s, and provide New York Wage Theft Prevention Act notices, which all identify the pertinent franchisee as the employer.  (*Id.*, ¶ 72.)  Moreover:

- Like hundreds of other employees of the Cookston Defendants, the *Kucher* Plaintiffs were informed of their respective wage rates by one of the Cookston Defendants' managers (R. 56.1, ¶ 76);

---

[11]    *See also Martin*, 2017 WL 4326109, at \*16 (no "control" where the alleged joint employer "conducted or directed evaluations" that included "monitoring . . . productivity and compliance"); *Jean-Louis*, 838 F. Supp. 2d at 127 (randomized weekly assessments).

- The employees of the Cookston Defendants received raises from their managers, not "Domino's" (*see id.*, ¶ 77);

- Tips at the stores were controlled by the Plaintiffs' respective managers (*id.*, ¶ 79); and

- Plaintiffs received their checks from their managers, not from "Domino's" (*id.*, ¶ 72).

Courts have consistently found that this "control" factor was not met in like circumstances. *See, e.g., Martin*, 2017 WL 4326109, at *18 (no joint employer where direct employer provided "paychecks and IRS Form 1099s" and made pay determinations).[12]

### iv.   The Domino's Defendants Do Not Maintain Plaintiffs' Employment Records

The "centrally relevant" inquiry under the last control factor is which entity "maintain[s] traditional personnel records . . . ." *Martin*, 2017 WL 4326109, at *19.   The Domino's Defendants do not maintain, and have never maintained, such records for the Cookston Defendants' employees.   (R. 56.1, ¶ 85.)  Rather, the Cookston Defendants create and maintain their own personnel records, including job applications, tax documents, I-9s and payroll records. (*Id.*)  The Domino's Defendants have never been given (or requested) this information.[13]  (*Id.*, ¶¶ 85-86.)

---

[12]     Given the allegations of their Complaint (*see Kucher* ECF No. 171, ¶ 64), Plaintiffs may attempt to argue that "Domino's" has some control over wages because franchisees are required to use DPF's PULSE point-of-sale system, which once had an optional function that could be used to estimate labor costs.  That would be incorrect. First, this function was optional.  (*See* R. 56.1, ¶ 83.)  Second, **the Cookston Defendants stopped using this optional feature *in 2009*** – well before the applicable statute of limitations.  (*Id.*)  Third, "the test is whether a putative joint employer determines pay rates, not whether it affects them." *Jean-Louis*, 838 F. Supp. 2d at 129-30.

[13]     More than seven years ago, e-mails reflect that a "Domino's" employee once was asked to assist an employee of the Cookston Defendants in conducting an IRS Form I-9 audit at a store.  (R. 56.1, ¶ 86.)  The fact that, in one instance, and at one store, a "Domino's" employee may have assisted one of Mr. Cookston's supervisors with an I-9 audit hardly establishes a joint employer relationship.  *Martin*, 2017 WL 4326109, at *19 (no joint employment where putative employer had access to database of personnel information); *see also Godlewska v. HDA*, 916 F. Supp. 2d 246, 262 (E.D.N.Y. 2013) (putative joint employer did not "maintain records" even though it reserved the right to review and duplicate same because the records were maintained by the "direct" employer).

2.     **The Domino's Defendants Did Not Exercise
"Functional Control" Over The Cookston Defendants' Employees**

In addition to the lack of formal control, the record is bereft of any evidence that "Domino's" exercised "functional control" over the Cookston Defendants' employees.

### i.     *Plaintiffs Never Used The Domino's Defendants' Premises Or Equipment*

The first *Zheng* factor examines if the alleged joint employer's premises and equipment are used by the purported joint employees.  *Zheng*, 355 F.3d at 73.  Here, it is undisputed that only the Cookston Defendants' equipment and premises were used to prepare and sell Domino's products.  (*See* R. 56.1, ¶¶ 88-91.)

### ii.     *There Was No Shift Of Employees To The Domino's Defendants*

Under the second *Zheng* factor, the threshold consideration is whether the direct employer's employees provide services to the alleged "joint employer" that can be shifted away to another "joint employer."  *Zheng*, 355 F.3d at 72; *see also Jean-Louis*, 838 F. Supp. 2d at 133.  In this case, the alleged "joint employees" do not provide **any** services to DPF:  they do not prepare pizzas, deliver pizzas, or perform services of any kind for the Domino's Defendants – they work exclusively for the Cookston Defendants, at stores owned and operated by the Cookston Defendants.  (*See* R. 56.1, ¶ 92.)  As such, there is nothing to "shift" away from DPF.

### iii.     *Plaintiffs Never Performed Functions Integral To The Domino's Defendants' Process of Production*

The third *Zheng* factor examines the "extent to which plaintiffs performed a line-job that is integral to the putative joint employer's process of production."  *Zheng*, 355 F.3d at 73.  In considering this factor, courts must determine whether the employee's work is part of the alleged joint employer's "integrated production unit."  *Godlewska v. HDA*, 916 F. Supp. 2d 246, 263 (E.D.N.Y. 2013), *aff'd*, 561 F. App'x 108 (2d Cir. 2014) (*quoting Zheng*, 355 F.3d at 73).  In this

case, the Cookston Defendants' employees perform job functions that involve the preparation, sale and delivery of pizza and other food products for the Cookston Defendants. (*See* R. 56.1, ¶ 1.)  There is no claim (much less evidence) that they perform any services (let alone services for an "integrated production unit" or "discrete line job") for any of the Domino's Defendants.

### iv.    Plaintiffs Cannot Pass From One "Subcontractor" To Another

The fourth *Zheng* factor – whether "responsibility under the contracts could pass from one subcontractor to another without material changes" – is inapplicable.  *Zheng* explained that where "employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, **this factor does not in any way support the determination that a joint employment relationship exists**."  *Zheng*, 355 F.3d at 74 (emphasis added).  Here, Plaintiffs "worked" for the Domino's Defendants only to the extent that the Cookston Defendants entered into franchise agreements with DPF.  This factor therefore "does not in any way support the determination that a joint employment relationship exists." *Id.*

### v.     The Domino's Defendants Did Not Supervise The Cookston Defendants' Employees

The fifth *Zheng* fifth factor – whether the nominal employer supervised the alleged joint employees – weighs in favor of joint employment "only if it demonstrates effective control of the terms and conditions of the plaintiff's employment."  *Zheng*, 355 F.3d at 74.  "By contrast, supervision with respect to contractual warranties of quality and time of delivery **has no bearing on the joint employment inquiry**, as such supervision is perfectly consistent with a typical, legitimate subcontracting relationship."  *Id.* (emphasis added); *accord In re Ovadia*, 19 N.Y.3d 138, 144-45 (2012); *Hugee*, 2013 WL 3299226, at *6.  The record makes clear that the Domino's Defendants' alleged "oversight" – *i.e.*, conducting site visits and occasional OERs – was limited

to enforcing DPF's standards, and had absolutely nothing to do with the terms and conditions of Plaintiffs' employment.  (*See* § IV.C.1.ii, *supra*.)

> ### vi.     The Cookston Defendants' Employees
> ### Never Performed Work for the Domino's Defendants

The sixth *Zheng* factor – whether the alleged "joint employees worked exclusively or predominantly for the putative joint employer" – also supports the entry of summary judgment. *Zheng*, 355 F.3d at 75.  The record is clear that during their employment with the Cookston Defendants, the Cookston Defendants' employees performed services only for the Cookston Defendants' franchises, not for the Domino's Defendants.   (*See* §§ II.A, II.B, IV.C.1.i, IV.C.1.ii, *supra*; *see also* R. 56.1, ¶ 37.)

## D.  Plaintiffs' Supposed Belief that "Domino's" Was Their Employer Is Irrelevant And Belied By The Record

Because they have no competent evidence of a "joint employer" relationship, Plaintiffs apparently intend to argue that the Domino's Defendants should be deemed their employers because they "thought" they worked for the Domino's Defendants.  In fact, at deposition, the Plaintiffs parroted the claim that they believed they were employed by "Domino's" because: (i) the Domino's® logo appear throughout the stores in which they worked and on the sign on the front of those stores; and (ii) various forms that the Cookston Defendants created had the Domino's logo on them or contained references to "Domino's" or "Domino's Pizza."  This assertion should be rejected for a host of reasons.

First, ignoring that (i) each Plaintiff received paychecks, New York State Wage Theft Notices, and W-2s and W-4s, and executed multiple documents identifying one of the Cookston Defendants (not "Domino's") as his employer (R. 56.1, ¶ 72), and (ii) each of Mr. Cookston's stores states conspicuously on its frontage that it is owned and operated by a Cookston Defendant (*id.*, ¶ 94), each Plaintiff has averred (in his Complaint and/or in Declarations

submitted to the Court) that he was "employed by Defendant Robert Cookston" and worked "at Domino's restaurants owned and operated by Mr. Cookston . . . ."   (*Id.*, ¶¶ 1-3.)  These allegations are judicial admissions that Plaintiffs cannot disavow to evade summary judgment.

Second, the "joint employer" analysis does not consider the display of a trademark, nor would such a focus be viable in the context of franchised businesses.  As noted above (*see* §§ II.C, II.D, *supra*), "a publicly identifiable trademark and trade name is the very essence of a franchise system."  *In re Convenient Food Mart, Inc.*, 1990 WL 51228, at *2 (N.D. Ill. Apr. 9, 1990).  If the mere usage of a franchisor's trademark created a joint employment relationship, every franchisor would become the joint employer of all of its franchisees' employees.  That the Cookston Defendants used some forms that contained Domino's® logo does not alter this principle, as it is undisputed that all of those forms were created solely by the Cookston Defendants (without the Domino's Defendants' knowledge).  (*See* R. 56.1, ¶ 62.)

Finally, Plaintiffs purported misapprehension is legally irrelevant, as the "joint employer" analysis hinges on the putative employer's control over the employees in question.  An employee's supposed confusion about who he worked for has no bearing on that question. *Martin v. Purolator Courier*, 1996 WL 429016, at *4 (E.D.N.Y. July 25, 1996) ("the joint employer issue does not turn on the perceptions of the employee since employee control is primarily a function of the objective relationship and understandings of the affected employers").

## V.   CONCLUSION

Based on the foregoing, Domino's Pizza, Inc., Domino's Pizza LLC, and Domino's Pizza Franchising LLC respectfully request that this (i) Court grant their Motion and enter Judgment in their favor on all of the counts in Plaintiffs' Complaint, and (ii) issue such other and further relief as the Court deems just and appropriate.

Dated:  New York, New York
         October 31, 2017

Respectfully submitted,

**DLA PIPER LLP (US)**

By: /s/ Norman M. Leon
    Norman M. Leon

Norman M. Leon
Joseph A. Piesco
Garrett D. Kennedy
1251 Avenue of the Americas
New York, New York 10020
Tel.:  (212) 335-4500
Fax:  (212) 335-4501
E-mail: norman.leon@dlapiper.com

*Attorneys for Defendants Domino's Pizza, Inc.,
Domino's Pizza LLC and Domino's Pizza
Franchising LLC*