**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
In re DOMINO'S PIZZA INC.                    :        MASTER FILE: 16 Civ. 2492 (AJN)
-------------------------------------------------------------X
THIS DOCUMENT RELATES TO:                    :
                                             :
RIAD KUCHER, HAROON MOJUMDER and             :
OMAR FARUK, on behalf of themselves and all  :        Case No. 16-cv-02492 (AJN)(KNF)
other similarly-situated employees,          :
                                             :
                    Plaintiffs,              :
                                             :
        v.                                   :
                                             :
DOMINO'S PIZZA, INC., et al,                 :
                                             :
                    Defendants.              :
-------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DOMINO'S
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**WIGDOR LLP**

David E. Gottlieb
Tanvir H. Rahman

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .............................................................................................................................1

I.    DOMINO'S MAY BE HELD LIABLE AS PLAINTIFFS' EMPLOYER UNDER
THE DOCTRINE OF OSTENSIBLE AGENCY ...............................................................1

II.    ISSUES OF FACT EXIST AS TO WHETHER DOMINO'S AND COOKSTON
ARE JOINT EMPLOYERS UNDER THE FLSA AND NYLL .........................................8

    A.    Standards ................................................................................................................8

    B.    Evidence of Control Under the *Herman* Factors ...................................................10

        1.    Domino's' Power to Hire, Fire and Discipline Cookston
Employees.....................................................................................................10

        2.    Supervision and Control of Schedules and Working Conditions ..............15

        3.    Domino's' Role in the Determination of Rate and Method of
Payment........................................................................................................21

        4.    Domino's' Maintenance of Employment Records ...................................21

    C.    Evidence of Functional Control Under the Zheng Factors ....................................23

III.    THE FRANCHISOR DEFENDANTS ARE PLAINTIFFS' JOINT EMPLOYERS........25

CONCLUSION.........................................................................................................................26

## **TABLE OF AUTHORITIES**

Ansoumana v. Gristede's Operating Corp.,
    255 F.Supp.2d 184 (S.D.N.Y. 2003).......................................................................... 8

Antenor v. D&S Farms,
    88 F.3d 925 (11th Cir. 1996) ............................................................... 11, 16, 17, 20

Barfield v. New York City Health and Hospitals Corp.,
    537 F.3d. 132 (2008)............................................................................... 9, 10, 22

Butler v. McDonald's Corp.,
    110 F. Supp.2d 62 (D. R.I. 2000)............................................................................ 2

Cano v. DPNY, Inc.,
    287 F.R.D. 251 (S.D.N.Y. 2012) ............................................................... 5, 11, 22

Carter v. Dutchess Community College,
    735 F.2d 8 (2d Cir. 1984) ................................................................................... 9

Chen v. Domino's Pizza, Inc.,
    No. 09 Civ. 107, 2009 WL 3379946 (D.N.J. Oct. 16, 2009).................................... 25

Cordova v. SCCF, Inc.,
    No. 13 Civ. 5665 (LTS)(HBP), 2014 WL 3512838 ......................................... 22, 23

Courtland v. GCEP-Surprise, LLC,
    No. 12 Civ. 00349 (PHX)(GMS), 2013 WL 3894981 (D. Ariz. July 29, 2013) ................. 2, 25

Crinkley v. Holiday Inns, Inc.,
    844 F.2d 156 (4th Cir. 1988) .............................................................................. 2

Donovan v. Breaker of Am., Inc.,
    566 F.Supp. 1016 (E.D.Ark. 1983)........................................................................ 25

Gessele v. Jack in the Box,
    No. 15 Civ. 1092 (BR), 2016 WL 7223324 (D.Or. Dec. 13, 2016) ........................ 25

Glatt v. Fox Searchlight Pictures,
    293 F.R.D. 516 (S.D.N.Y. 2013) ................................................................... 10, 11

Hatcher v. Augustus,
    956 F.Supp. 387 (E.D.N.Y. 1987) ...................................................................... 25

Herman v. RSR Security Services, Ltd.,
    172 F.3d 132 (2d Cir. 1999)............................................................................ *passim*

Hmied v. Timpano Acquisition, LLC,
   No. 6:13 Civ. 1002 (ORL)36, 2014 WL 1293362 (M.D. Fla. Mar. 28, 2014) ......................... 2

Irizarry v. Catsimatidis,
   722 F.3d 99 (2d Cir. 2013) .................................................................................................. 9, 20

Jean-Louis v. Metropolitan Cable Comm., Inc.,
   838 F.Supp.2d 111 (2011) ........................................................................................................ 11

Kaplan v. Coldwell Banker Residential Affiliates, Inc.,
   69 Cal. Rptr. 2d 640 (Cal. App. 2d Dist. 1997) ................................................................... 3, 4

Lawrence v. Adderley Indus. Inc.,
   No. 09 Civ. 2309, 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011) ............................................. 11

Lopez v. Silverman,
   14 F.Supp.2d 405 (S.D.N.Y. 1998) ...................................................................... 9, 17, 20, 24

Lovett v. SJCZ Fulton IND I, LLC,
   2016 WL 4425363 (N.D.Ga. Aug. 22, 2016) ......................................................................... 25

Martin v. Sprint United Mgmt. Co.,
   No. 15 Civ. 5237 (PAE), 2017 WL 4326109 (S.D.N.Y. Sept. 27, 2017) ............................... 11

Ochoa v. McDonald's Corp.,
   133 F. Supp.3d 1228 (N.D. Cal. 2015) ........................................................................... passim

Olvera v. Bareburger Grp. LLC,
   73 F.Supp.3d 201 (S.D.N.Y. 2014) ........................................................................... 11, 12, 17

Orozco v. Plackis,
   757 F.3d 445 (5th Cir. 2014) ................................................................................................... 24

Patterson v. Domino's Pizza,
   60 Cal. 4th 474 (2014) ............................................................................................................ 25

Reese v. Coastal Restoration & Cleaning Svcs, Inc.,
   2010 WL 5184841 (S.D.Miss. Dec. 15, 2010) ....................................................................... 25

Rutherford Food Corp. v. McComb,
   331 U.S. 722 (1947) ................................................................................................................... 9

Singh v. 7-Eleven, Inc.,
   No. 05 Civ. 4534 (RMW), 2007 WL 715488 (N.D. Cal. Mar. 8, 2007) ................................. 25

Stern v. Starwood Hotels & Resorts Worldwide, Inc.,
 52 N.Y.S.3d 58 (1st Dep't 2017) ........................................................................ 2

Torres-Lopez v. May,
 111 F.3d 633 ......................................................................................... 16, 17, 21

Vann v. Massage Envy Franchising LLC,
 2015 WL 74139 (S.D.Cal. Jan. 6, 2015)............................................................. 25

Velez v. New Haven Bus Service, Inc.,
 No. 13 Civ. 19 (JBA), 2015 WL 75361 (D.Conn. Jan. 6, 2015) ....................... 15, 24

Zheng v. Liberty Apparel Co.,
 355 F.3d 61 (2d Cir. 2003)............................................................................. *passim*

## **Other Authorities**

29 U.S.C. § 203(g) ..................................................................................................... 8

29 C.F.R. § 791.2(b) ............................................................................................... 8, 9

NYLL §§ 651 ............................................................................................................. 8

The *Kucher* Plaintiffs respectfully submit their memorandum of law in opposition to the motion for summary judgment submitted by the Domino's Defendants (herein, "Domino's").  As detailed herein, issues of fact exist as to whether Domino's may be liable as Plaintiffs' employer.

## PRELIMINARY STATEMENT

Domino's argues that it cannot be held liable as Plaintiffs' employer despite the fact that it has been on actual notice and fully aware that employees of the Cookston Defendants (herein, "Cookston") have been under the perception that they are employed by Domino's and Domino's has done absolutely nothing to clarify to such employees that it is not their employer.  Domino's argues that it is irrelevant whether Cookston employees are under this misperception, and irrelevant whether Domino's takes action to correct this belief or, through negligence and inaction, permits Cookston employees to carry this belief.  Moreover, despite substantial evidence that Domino's asserts control over the personnel decisions, working conditions and wage payments to Cookston employees, Domino's rests on a general proposition that franchisors are not typically liable for the conduct of their franchisees.  In this context, Domino's is incorrect.

## ARGUMENT

## I.    DOMINO'S MAY BE HELD LIABLE AS PLAINTIFFS' EMPLOYER UNDER THE DOCTRINE OF OSTENSIBLE AGENCY

A franchisor or parent company may be held liable for the actions of a franchisee or subordinate entity under an "ostensible agency" theory.  Contrary to Domino's argument that an employee's belief as to the identity of his or her employer is irrelevant (Defs.' Mem. at 24-25), it is in fact one of the very clear elements of ostensible agency test.  Ostensible agency exists where: (1) the person dealing with the agent does so with reasonable belief in the agent's authority, (2) that belief is generated by some act or neglect of the principal sought to be

charged, and (3) the relying party is not negligent.  See, e.g., Ochoa v. McDonald's Corp., 133 F. Supp.3d 1228 (N.D. Cal. 2015).

Ostensible agency (also known as agency-by-estoppel or apparent agency) is an established common law doctrine, including under New York law.  See e.g. Stern v. Starwood Hotels & Resorts Worldwide, Inc., 52 N.Y.S.3d 58, 59 (1st Dep't 2017) (recognizing ostensible agency theory in franchisor-franchisee context); Butler v. McDonald's Corp., 110 F. Supp.2d 62, 68 (D. R.I. 2000) (applying doctrine of apparent agency in franchisor-franchisee context); Hmied v. Timpano Acquisition, LLC, No. 6:13 Civ. 1002 (ORL)36, 2014 WL 1293362, at *6 (M.D. Fla. Mar. 28, 2014) (stating in FLSA action that "Florida law also recognizes the doctrine of apparent agency, where a principal creates the appearance of an agency relationship through its actions"); Courtland v. GCEP-Surprise, LLC, No. 12 Civ. 00349 (PHX)(GMS), 2013 WL 3894981, at *9 (D. Ariz. July 29, 2013) (acknowledging "apparent agency" theory in franchisor-franchisee FLSA context); Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 157 (4th Cir. 1988) (recognizing apparent agency doctrine in franchisor-franchisee context).

Here, the first prong – Plaintiffs' reasonable belief that Domino's is their employer – is easily met.  There are clearly issues of fact as to whether Plaintiffs believed Domino's employed them – to wit, Plaintiffs all affirmatively testified to this belief.  See ¶ 96[1] (Hossain testifying that he worked for Domino's and that the store he worked at was owned by Domino's); (Faruk testifying that he worked for Domino's Pizza and that Robert Cookston is a part of Domino's Pizza); (Mojumder testifying that he applied to work at Domino's Pizza and that his supervisors worked for Domino's Pizza); (Kucher testifying that he worked for Domino's Pizza); Boby

---

[1]    Citations to "¶ __" herein will refer to Plaintiffs' Responses to the paragraphs of the Domino's Defendants' "Statement of Undisputed Material Facts," as contained in "*Kucher* Plaintiffs' Local Rule 56.1 Counterstatement," and to "Plaintiffs' Statement of Additional Material Facts to Which There Exists a Genuine Factual Dispute To Be Tried."

testifying that he believed that Robert Cookston worked for Domino's, and that the Cookston Defendants and Domino's are the same company).

Moreover, there is no question that there are issues of fact as to whether such belief is reasonable under the circumstances.  As an initial matter, Plaintiffs' belief that Domino's was their employer included the fact that they (i) were told they would be working at Domino's, (ii) wore Domino's uniforms containing a Domino's logo, (iii) observed their managers in Domino's uniforms, (iv) prepared and/or delivered food in Domino's packaging, (v) were instructed to greet customers by saying, "Welcome to Domino's," and (vi) their managers and co-workers regularly referred to themselves as working for Domino's.  See ¶ 97 (Hossain testifying he was told he would be working at Domino's when he applied, was bound by Domino's rules, and the name Domino's Pizza is written everywhere); (Faruk testifying that Domino's logo was everywhere, that Domino's does inspections, numerous documents have the Domino's logo, and everything he ever signed had the Domino's logo); (Mojumder testifying about Domino's' name and logo on job paperwork, paperwork with rules and regulations having the Domino's logo, and Domino's' signage on the door); (Kucher testifying that his belief was based on Domino's logo being written everywhere, being allowed to call Domino's' hotline, observing inspections done by Domino's, and having to follow Domino's rules and regulations); (Boby testifying that belief was based on Domino's logo on uniforms, boxes, paystubs and "every document.").

That alone would be sufficient to create a justifiable and reasonable belief – certainly issues of fact sufficient to overcome summary judgment.  See e.g. Ochoa, 133 F.Supp.3d at 1239-40 (belief that McDonald's was employer justified based on being required to wear McDonald's uniforms, serve food in McDonald's packaging and receive paperwork with McDonald's name); Kaplan v. Coldwell Banker Residential Affiliates, Inc., 69 Cal. Rptr. 2d 640

(Cal. App. 2d Dist. 1997) (despite franchise agreement, the holding out to the public that franchisor "stood behind" the franchisee through use of name, logo and referring to franchisee as a "member" sufficient to establish ostensible agency).

However, there is far more. Even more specifically, documents that one would expect to *clearly* state the identity of the actual employer only create confusion and mislead employees to believe that Domino's and not Cookston was their employer:

- Plaintiffs' *paystubs* contained Domino's logo, (¶ 97);

- Plaintiffs' *job applications* use the Domino's Pizza name and logo throughout and ***do not make any reference to Cookston***, (¶¶ 99-100);

- Cookston requires employees to sign policy acknowledgments that contain Domino's logo and ***make no reference to the Cookston***, (¶ 102);

- Cookston provides employees with a certificate when they complete training programs that used the Domino's Pizza name and logo but ***make no reference to Cookston***, (¶ 103);

- Cookston provides Plaintiffs with an application for health insurance in which "Domino's Pizza" is listed as an employer, and other benefits-related paperwork also state that Domino's was the employer, including healthcare benefits letters addressed ***from*** "Domino's Management Team" and refers to benefits that "Domino's will offer," (¶ 113); and

- Cookston requires employees who use bicycles to sign a "Bicyclist Agreement" which requires such employees to notify "Domino's Pizza" if they receive a ticket and makes no reference whatsoever to Cookston or any franchise relationship. (¶ 110).

However, to the extent there is any doubt whether an issue of fact exists as to whether Plaintiffs' belief is reasonable, employees who are not delivery drivers are required to sign agreements that expressly state:

"***I am employed by Domino's Pizza***,"

¶ 105. That document makes no reference to Cookston or any franchise structure.  ¶ 105. Plaintiffs all testify that no one ever told them that Domino's was not their employer or explained the nature of the franchise relationship.  ¶¶ 118-121.  Domino's cannot legitimately

4

argue that there is not even an issue of fact as to whether Plaintiffs believed that Domino's was their employer and whether such belief was justifiable, when Plaintiffs were required to sign documents stating just that fact.

Domino's may argue that this proves nothing because the term "Domino's Pizza" does not necessarily refer to the Franchisor Defendants.  However, the Franchisor Defendants' own employees testified that the term "Domino's Pizza" refers to Domino's corporate franchisor. ¶108 (Rudd testifying that "Domino's Pizza" is the brand and the company he works for, and that the term "Domino's Pizza" means the corporate entity).  Moreover, Robert Cookston – owner of the Cookston Defendants – also agrees that the term "Domino's Pizza" could refer to the Domino's corporate franchisor.  ¶ 107.  Lou O'Neill, Cookston's Operations Director and second-in-command, testified that employees know who they work for because of the documentation (id.), though the documentation overwhelming states "Domino's Pizza," not Cookston.  As such, there can be no doubt that Plaintiffs were under a reasonable belief that Domino's employed them, whether together with Cookston or independently.

The second prong – that Domino's was negligent in permitting Cookston employees to believe that Domino's was their employer – is also easily met.  There can be absolutely no doubt that Domino's has been on express and actual notice for many years that Cookston employees believe that Domino's is their employer:

- New York Domino's franchise employees have been alleging that Domino's is their employer going all the way back to 2010.  ¶ 164 (Complaint in Cano v. DPNY, Inc. et al, No. 10 Civ. 7100 (ALC)(JCF) (S.D.N.Y.).  Moreover, the Honorable James C. Francis IV denied Domino's request to preclude the plaintiff-employees from pursuing claims against Domino's, arguing that there was no legitimate basis to hold the franchisor liable for wage violations occurring at franchise locations.  Cano v. DPNY, Inc., 287 F.R.D. 251 (S.D.N.Y. 2012).  Clearly, Domino's was on notice that its New York franchisee's employees felt that Domino's was their employer, and that there was a sustainable basis for such belief.

- The New York State Attorney General, following multiple investigations into Cookston's wage and labor violations and admissions by Cookston that such violations were committed, issued a public statement calling on Domino's to be more intimately involved in Cookston's affairs and to ensure that franchisees are working under lawful conditions.  ¶ 165 (NYSAG statement published April 14, 2015).

- Numerous Cookston employees have complained to Domino's through the Domino's provided hotline, and in such complaints stated their belief that their employer was "Domino's" or "Domino's Pizza."  See ¶ 126 (Cookston employee stating that she is "an employee for Domino's Pizza," and another stating that he "worked for Domino's Pizza"). However, there is no evidence whatsoever that anyone at Cookston or Domino's ever cured any confusion as to the identity of the employer.  See ¶ 127 (Rudd testifying he not aware of anyone clarifying complaining employees' confusion).

Plaintiffs have established Domino's awareness – or at the very least issues of fact regarding their awareness – that Cookston employees, such as Plaintiffs, believe they are employed by Domino's.  In light of that fact, Domino's has been utterly negligent in taking any action to correct Cookston employees' supposed misbelief.

Mark Rudd, Domino's' Area Leader and Vice President of Operations covering Cookston stores from March 2010 through August 2014, was responsible for being a liaison between Domino's and franchisees such as Cookston.  ¶ 109.  Despite this role, and Domino's' awareness that Cookston employees believed Domino's employed them, Mr. Rudd testified that he does not think it even matters if Cookston employees believe they are employed by Domino's.  See id. (Rudd testifying to having no opinion whether it is important for franchise employees to know that they are not employed by Domino's).  Mr. Rudd also testified that he never told anyone at Cookston to tell employees that Domino's does not employ them.  See id.  (Rudd testifying that he never made sure franchises told employees that they were not employed by Domino's).[2]

---

[2]     In fact, Rudd did see the employment application Cookston uses (and has used for at least the past ten years without modification) ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

Kim Ridge, Domino's' Vice President of Franchise Operations in the East Region for the last 14 years, is responsible for overseeing franchisee operations, including the Cookston stores. Id. Ms. Ridge testified both as a fact witness and as a Rule 30(b)(6) corporate representative. Id. Ms. Ridge testified that Domino's has **never** objected to Cookston's use of the Domino's logo, that she does not know whether Domino's has **ever** told Cookston that they cannot tell employees that Domino's is their employer, that she in unaware of any obligation Domino's has imposed on Cookston to ensure that the franchise relationship is explained to employees, that Domino's has never investigated how or if Cookston communicates the franchise relationship to employees, and that she has no idea what is communicated to Cookston employees during the onboarding or training process, and has never inquired about it.[3]

Had Rudd or Ridge – or anyone else for that matter – ever taken any actual steps to investigate the basis for employees believing that Domino's employed them, they would have quickly unearthed all the information we have set forth above demonstrating that employees are misled as to the identity of their employer. Domino's failure to take any such action constitutes negligence – or creates an issue of fact as to whether it was negligent – that has contributed to the belief that Domino's is the Cookston employees' employer.

Lastly, the third prong is met, as there is no basis to claim that Plaintiffs were at all negligent in believing that Domino's employed them. As set forth above, there were more than enough reasons for Plaintiffs to believe they were employed by Domino's, and no Domino's or Cookston representative ever made it clear that Domino's was not their employer.

---

[3] While Domino's will argue that Rudd's and Ridge's lack of involvement with Cookston demonstrates the lack of a "joint employer" relationship, this position misses the mark. Whether there is a joint employer relationship or not, Domino's cannot claim the lack of an ostensible agency relationship when it is on notice that employees believe Domino's is their employer, and they have done absolutely nothing to disavow that belief.

Ochoa is directly on point.  In Ochoa, as in the matter at bar, employees of a McDonald's franchisee alleged wage violations and sought to hold the franchisor liable under both a "joint employer" and "ostensible agency" theory.  Following discovery, McDonald's moved for summary judgment, arguing – just as Domino's does here – that a franchisor cannot be held liable for wage violations of a franchisee.  However, the Ochoa court denied summary judgment as to the ostensible agency theory based merely on declarations from the plaintiffs that they wore McDonald's logoed uniforms, used McDonald's logoed boxes, and orientation and paystub documents also contained the logo.  Id. at 1239-40.  Here, as set forth above, in addition to the identical documentary evidence present in Ochoa, Cookston also expressly and specifically represented to employees that "Domino's Pizza" employed them.  Accordingly, the same result should respectfully be reached here as was reached in Ochoa.

## II.   ISSUES OF FACT EXIST AS TO WHETHER DOMINO'S AND COOKSTON ARE JOINT EMPLOYERS UNDER THE FLSA AND NYLL

### A.   Standards

The FLSA and NYLL are remedial statutes designed to protect workers, and as such, the term "employer" is to be broadly construed.  Ansoumana v. Gristede's Operating Corp., 255 F.Supp.2d 184, 188-89 (S.D.N.Y. 2003).  The term "employer" includes "any individual, partnership, association, corporation … or any organized group of persons acting as employer." 29 U.S.C. § 203(g); NYLL §§ 651(6), 2(7).  This is "the broadest definition [of 'employ'] that has ever been included in any one act," covering relationships that "were not deemed to fall within an employer-employee category" at common law.  Zheng v. Liberty Apparel Co., 355 F.3d 61, 69 (2d Cir. 2003).  Multiple entities or individuals can be treated as "joint employers" "[w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly,

by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer."  29 C.F.R. § 791.2(b).

"The determination of the employment relationship does not depend on such isolated factors as where work is done or how compensation is divided 'but rather upon the circumstances of the whole activity.'"  Irizarry v. Catsimatidis, 722 F.3d 99, 104 (2d Cir. 2013) (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)).  This concept has been termed the "economic realities" test.  See Barfield v. New York City Health and Hospitals Corp., 537 F.3d. 132, 145 n.8 (2008) ("Because the economic realities test depends on the totality of the circumstances arising in a particular employer-employee context, our decision today is limited to the facts of this case").  The "object of the economic reality test" "is not to determine whether the workers at issue are more economically dependent on" the immediate or the putatively joint employer, but rather "whether the totality of the evidence . . . demonstrates the economic dependence of the [workers] on both of those employers."  Lopez v. Silverman, 14 F.Supp.2d 405, 423 (S.D.N.Y. 1998) (emphasis in original) (quotations omitted).

To examine the "totality of the circumstances," courts generally look to "formal" and "functional" factors analysis.  The Second Circuit has identified four factors establishing "formal" control – whether the putative employer: (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.  Herman v. RSR Security Services, Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (citing Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir. 1984)).

However, in Zheng, the Second Circuit recognized that "Carter did not hold . . . that those [four formal control] factors are necessary to establish an employment relationship" (Zheng, 355

F.3d at 71 (emphasis omitted)), and identified several other factors that could establish a putative

employer's "functional" control over a worker's employment.[4]

To give "proper effect" to the broad language of the FLSA and NYLL, both the "formal"

and "functional" control tests are, rather than "rigid rule[s]," merely "nonexclusive and

overlapping set[s] of factors [that] ensure that the economic realities test . . . is sufficiently

comprehensive and flexible." Barfield, 537 F.3d at 143.  A party need not satisfy all of the

factors, and the District Court is "free to consider any other factors it deems relevant to its

assessment of the economic realities." Zheng, 335 F.3d at 71-72 (internal citations omitted).

## B.    Evidence of Control Under the *Herman* Factors

There are genuine issues of fact in dispute as to whether Domino's maintains ongoing

and extensive control over the Cookston stores under the four-part Herman test.  The significant

question is not whether control over employees was exercised constantly, uniformly or directly,

but simply whether control "existed." Herman, 172 F.3d at 139.  "Control may be restricted, or

exercised only occasionally . . . since such limitations on control "do[] not  diminish the

significance of its existence.'" Id. at 130 (internal citations omitted).

### 1.    Domino's' Power to Hire, Fire and Discipline Cookston Employees

The first Herman factor examines whether the joint employer has the power to hire and

fire the employees.  Id. at 137, 139 (joint employer "participated in" hiring and recruiting some

[] employees").  A putative joint employer need only possess the *power* to hire and fire, and does

not need to have actually ever wielded that authority.  See, e.g., Glatt v. Fox Searchlight Pictures,

---

[4]      Those factors are: (1) whether the putative joint employer's premises and equipment were used; (2)
whether the front-line employer had a business that could or did shift as a unit from one putative joint employer to
another; (3) the extent to which employees performed a discrete line-job that was integral to the putative joint
employer's process of production; (4) whether responsibility under the contracts between the direct and putative
joint employer could pass from one entity to another; (5) the degree to which the putative joint employer or its
agents supervised employees' work; and (6) whether employees worked exclusively or predominantly for the
putative joint employer.  Id. at 72.

293 F.R.D. 516, 526 (S.D.N.Y. 2013) (ability to hire is enough to satisfy first <u>Herman</u> factor).

Thus, the level of "participation" under <u>Herman</u>'s first factor can include the power to veto

hiring decisions (see <u>Antenor v. D&S Farms</u>, 88 F.3d 925, 935 (11th Cir. 1996), or a franchisor

providing guidance to franchisees on "how to hire and train employees."  <u>Olvera v. Bareburger</u>

<u>Grp. LLC</u>, 73 F.Supp.3d 201, 296 (S.D.N.Y. 2014).  "Participation" may also include

involvement in background checks beyond a requirement that they be performed.  <u>See</u>, <u>e.g.</u>,

<u>Cano v. DPNY, Inc.</u>, 297 F.R.D. 251, 260 (S.D.N.Y. 2012) (Domino's' "develop[ment] and

implement[ation of] hiring policies such as systems for screening …and assessing applicants"

sufficient, with other factors, to grant motion to add Domino's as joint employer).

 Here, genuine issues of fact exist as to whether Domino's exercises control over hiring at

Cookston stores.  In Mr. Cookston's own words, Domino's "plays a role" in how his stores hire

employees, including by requiring him to run criminal background and driver history checks on

all prospective hires before he can extend offers of employment.  ¶ 21.  In fact, Domino's

requires Cookston to use a pre-approved vendor to perform these checks, and prohibits him from

hiring or employing anyone who has been convicted of a crime that "could negatively affect

public safety, team member safety, the ability to perform duties in compliance with all

requirements, or the public perception or reputation of the Domino's brand."[5]  <u>Id.</u>  Significantly,

Cookston does not know what information and standards are used to actually perform these

background checks, or what determines if someone can or cannot work at his stores; Cookston

---

[5]  Domino's' express *prohibition* against Cookston being able to employ individuals convicted of committing certain crimes, renders this case different from <u>Martin v. Sprint United Mgmt. Co.</u>, No. 15 Civ. 5237 (PAE), 2017 WL 4326109, *5 (S.D.N.Y. Sept. 27, 2017) and <u>Jean-Louis v. Metropolitan Cable Comm., Inc.</u>, 838 F.Supp.2d 111, 123 (2011) where the putative joint employer merely had to "conduct" or complete "background checks."  The facts here are also distinguishable from <u>Jean-Louis</u> and <u>Lawrence v. Adderley Indus. Inc.</u>, No. 09 Civ. 2309, 2011 WL 666304, *3 (E.D.N.Y. Feb. 11, 2011) where criminal background checks were performed for obvious safety reasons on cable technicians who must visit customers' homes (unlike a Cookston employee who makes pizzas inside a store).

merely "follows the Domino's standards on when an applicant meets its background check standard." Id.

Domino's closely monitors a franchisee's compliance with Domino's' background check requirements, including by soliciting information from their pre-approved vendors about the number of background checks a franchise has ordered. ¶ 35. In fact, Ms. Ridge has told her Area Leader team (responsible for directly liaising with franchisees) that non-compliant franchisees should be placed in default, and terminated if not cured. Id. ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████ Domino's exerts other pressure and influence on Cookston's hiring practices as well. For instance, Cookston is prohibited from soliciting or hiring employees from any other Domino's franchise or corporate store. ¶ 21. Furthermore, Domino's has required that Cookston hire more drivers in response to a poor score on OER inspections (id.), and pushed Cookston to retain the manager of a store Cookston was in the process of acquiring. Id. Domino's also requires that Cookston enter the driver's license and auto insurance information for all employees and hires into the PULSE system, Domino's' propriety point-of-sale system that all Cookston stores must purchase from Domino's, and which records and tracks all revenue and expenses, as well as employees' time worked. ¶¶ 43, 85, 147. If either has expired, the employee cannot clock into PULSE, and thus cannot work. ¶ 85.

Control is similarly asserted by Domino's with respect to firing or discipline, which even if "restricted, or exercised only occasionally," also shows joint employment. Herman, 172 F.3d at 137, 139; Olvera, 73 F.Supp.3d at 207 ("authority to hire and fire employees" a factor in finding joint employment). Here, there is overwhelming evidence in the record that Domino's

has exerted significant control, both direct and indirect, over the firing and discipline of Cookston employees, beyond making mere "suggestions."

For instance, Mr. Cookston, in his own words, has vividly detailed how he was forced by Domino's CEO David Brandon and other executives to discipline two of his store employees. Specifically, after Brandon and others took offense to the appearance of the food a Cookston employee delivered to Fox Business News (Brandon was being interviewed), Brandon and other Domino's executives told Mr. Cookston that his apology was not sufficient, and that something "had to be done." ¶ 53. While Mr. Cookston did not want to discipline his employee, and did not think that discipline was appropriate given that the employee had agreed to wake up and prepare the order very early in the morning, hours before the store even opened, he felt he had no choice because Domino's was directing him to discipline the employee. Id. After informing Brandon about the disciplinary actions he planned to take – which included suspending the employee without pay and demoting and removing him from a "Manager in Training Program," as well as demoting the store's GM to "Junior Manager" – Brandon told Cookston that he was "convinced" that Cookston was "responding [] in an appropriate manner and taking [necessary measures]." Id. To ensure that Cookston followed through with his employee disciplinary plans, Domino's placed the store from which the delivery originated in default, and required Cookston to provide documentary proof of the actions ordered to cure it. Id. Mr. Cookston was then subjected to increased inspections of his stores, including from Domino's executive-level employees, separate and apart from regular inspections, and was kept in the default for three months. Id.

Furthermore, James Mumma, a former Cookston GM and Supervisor from 2009 to 2012, was once told that two Domino's Area Leaders wanted someone at a Cookston store in

13

Connecticut "held accountable" for a low OER score.[6]  ¶ 28.  Subsequently, the GM, Shift

Runners and CSRs working at the store in question were all fired.  Id.  Mumma also recalls that

an Area Leader and OER coach both wanted him to fire the ASM of a store that he supervised

for purportedly not properly proofing pizza dough, and for having body odor.  Id.  Mumma is not

certain whether this employee was ultimately disciplined as he himself was terminated by Mr.

Cookston just days later.  Mr. Cookston told Mumma that it was "corporate [who was] making

me make a change, so I have to ask for your resignation."  Id.

        In addition, Domino's Safety and Security Director Van Carney urged Cookston to fire

an employee who was found to be in this country illegally, and who clocked in under two names

to avoid being paid overtime.  Id.  Cookston did not deny that any employees were disciplined as

a result of Carney's findings and recommendation.  Id.  Notably, Ridge then directed Rudd to

"address the concern," and within two weeks, Rudd notified Mr. Cookston that he would be

conducting an audit of the personnel paperwork for all employees at three Cookston stores.  Id.

        Moreover, Cookston's Director of Operations, Lou O'Neill, once terminated an employee

named "Aaron" less than an hour after O'Neill finished meeting with Rudd.  Rudd subsequently

asked O'Neill whether he had "pull[ed] the trigger on Aaron."  Id.  Rudd did not deny that he

gave O'Neill his "opinion" of Aaron's termination.  Id.  At another time, O'Neill notified Rudd

that he had terminated the GM, ASM and Shift Runner at a store that Rudd had recently placed

in default, to which Rudd responded by praising O'Neill and telling him that his "dedication to

the task at hand [is] second to none."  Id.

        Domino's has also instructed Mr. Cookston to discipline his workers short of termination.

For instance, Rudd recommended that O'Neill call certain Cookston employees suspected of

improperly adjusting their store's service data into a meeting, "let them know that you and [a]

---

[6]        Notably, Area Leaders are themselves evaluated on the OER scores of franchises that they oversee.  ¶ 141.

Supervisor will be in attendance," have a "verbal warning form filled out and signed," and that if Cookston himself "need[ed] to be in attendance [] to drive [a] point[,] so be it."  After O'Neill agreed with the direction, Rudd responded, "Go get' em."  ¶ 142.

Furthermore, Domino's Safety and Security Department routinely notifies Cookston when it suspects certain Cookston employees of "manipulating sales/orders," such as by reporting completed deliveries as "bad orders," and sends him reports "supporting" their findings.  When this happens, Domino's advises Cookston how to investigate the allegations, informs him of the amount of estimated losses, and tells him to advise Domino's of his findings and resolution.  ¶ 54.  After one of these notifications, an Area Leader told Cookston to not "take this lightly" and to "ask many questions."  Id.[7]

The foregoing evidence shows that, even if "restricted, or exercised only occasionally," Domino's had the power and/or exercised the power, to hire, fire and exercise disciplinary authority over Cookston, or that there are at least genuine issues of fact as to the first Herman factor.

### 2.      Supervision and Control of Schedules and Working Conditions

Genuine issues of fact exist as to the second Herman factor – whether Domino's exerts supervision and control over employee schedules and working conditions.  This factor can be satisfied where an employer does not dictate particular employees' individual shifts or schedules, but effectively dictates an overall schedule.  See Velez v. New Haven Bus Service, Inc., No. 13 Civ. 19 (JBA), 2015 WL 75361, at *6 (D.Conn. Jan. 6, 2015) ("Yale may have exerted control over . . . work assignments of bus drivers by setting the bus routes, schedules, and stops.");

---

[7]      Domino's has also instructed other franchisees about employee disciplinary issues. For example, Rudd instructed Anthony Maestri, another franchisee, to discipline an employee in response to a complaint Domino's received about a manager at one of his stores using foul language, telling Maestri this "has got to stop" and "to hold someone accountable." Id.

Torres-Lopez v. May, 111 F.3d 633, 642 (joint employers "controlled the overall harvest schedule," including deciding when it was unsuitable for farming, and controlled number of workers needed); Antenor, 88 F.3d at 934 (growers dictated workers' hours by, *inter alia*, directing number of workers needed, and when they would begin the day).

Domino's controls the scheduling of Cookston's employees by, *inter alia*, setting each Cookston store's hours of operation, as well as the days stores must open (*i.e.*, every day but Thanksgiving, and Christmas/Christmas Eve). ¶ 43. Cookston stores that do not comply with the hours or days of operation Domino's sets could be placed in default. Id. In fact, Cookston testified that an Area Leader called to inquire why another franchisee's store was not open during the Super Bowl. Id. While a store can apply to Domino's for a "variance" or exception from the hours of operation Domino's sets, Cookston has never "fought" Domino's. Id. Indeed, when Ridge learned that Cookson was considering applying for a variance, her reaction was, "Store 3352? Why would I even consider it?" Id.

Domino's closely monitors whether a franchise store is open during the hours Domino's sets by reviewing employee clock-out information. Id. Domino's has even threatened to "lock" non-compliant franchises from being able to temporarily adjust their store's operating hours on PULSE, meaning that they would have to make a service call to Domino's (and be charged for doing so) to make a change in their hours, such as in the event of an emergency. Id. Further, after Domino's decided to extend certain Cookston stores' hours of operation past 2:00 a.m., Cookston complained to his Area Leader about how his "team members have lives and need more quality of life than more hours to have to work," and about how it "is getting harder to find team members to work closing shifts as they often leave the store at 5-6am." Id. Domino's went

16

against Cookston's wishes and required him to extend those stores' hours, and thus those employees' hours anyway.  Id.

Domino's also requires that at least two employees remain in the store after a store's hours of operation end and, until a store is secured and vacated for the night.  Id.  Further, Domino's personnel have even provided written instructions to Cookston concerning employee scheduling and staffing levels, including directives to "cross-train" workers, and to schedule employees in 15-minute increments.  Id.  Domino's has also required Cookston stores to use a PULSE program called "Labor Scheduler," which can be used to manage labor and labor costs by projecting the ideal number of employees in each position that would be needed in the store at any given time to meet anticipated demands.  Id.

Domino's further supervises and controls franchisee working conditions by, *inter alia*, setting and enforcing rigorous employee standards (that go beyond merely ensuring product and service consistency and quality, and brand protection) through regular inspections and on-site visits, and through its involvement in addressing customer and employee complaints.

Inspections and enforcement of standards are probative of the second Herman factor. See, e.g., Antenor, 88 F.3d at 934-35 (growers' representatives walked job site, spoke directly to employees, and brought problems to direct employer's attention); Lopez, 14 F.Supp.2d at 421 (garment manufacturer directly monitored garment quality and conducted on-site quality control inspections, even though manufacturer "did not hire or fire [workers], set their hours or rates of pay, or handle their payroll or employment records"); Torres-Lopez, 111 F.3d at 642 (finding "significant control over farmworkers' working conditions" based on right to inspect and onsite presence of company official).[8]

---

[8]     See also Olvera, 73 F. Supp. 3d at 207 (denying franchisor's motion to dismiss, as pleadings alleged, among other things, franchisor "monitored employee performance," "specified [the] methods and procedures used

Domino's supervises and controls Cookston employees by requiring that all workers be trained using Domino's training modules before beginning work.  ¶ 57.  Domino's also reviews training results and performance evaluation materials Cookston stores use, and Domino's employees have even been asked to attend Cookston employee performance review meetings.  ¶¶ 56, 57.  Domino's further supervises and controls employees at Cookston stores by enforcing the standards contained in its Operating Standards, which requires, among other things, exacting criteria for employee appearance and grooming, as well as rules for employee conduct and procedures, both when working in-store and when making deliveries. ¶¶ 144-45.[9]

Domino's enforces these standards through its Area Leaders and the application of a wide-ranging evaluation program (OER), with unannounced, one and a half hour-long on-site inspections (scored from 1 to 100) at least three times a year.  ¶¶ 66, 144.  In these inspections, Domino's deducts points from a Cookston store non-compliance with employee rules and standards, including attire, grooming and conduct rules.  ¶¶ 144, 152-153.  OER inspectors directly interact with Cookston store personnel, and instruct employees to, *inter alia*, throw away pizza pans they determined were not clean, clean the store, and have even "talk[ed] down to" employees and told an employee with a thick accent "why don't you learn to speak English?"  ¶¶ 68, 125.  OER inspectors also evaluate how Cookston store employees interact with customers, such as by testing whether they say, "Welcome to Domino's" within nine seconds, and by pretending to be dissatisfied customers to evaluate how they handle customer complaints.  ¶ 68.

---

by []employees to prepare customer orders," and "exercised control, directly or indirectly, over [the] work of employees," notwithstanding consideration of franchisor's "right to inspect the facilities and operations of franchises, to audit any franchise's financial records, and to terminate the franchise agreement").

[9] ████████████████████████████████████████████

In addition, Domino's requires Cookston stores to conduct regular "Self-OERS," and report the results to Domino's.  ¶ 57.

Domino's has placed Cookston stores in default of their franchise agreements for having received bad OER scores, including because of personnel-related issues.  Domino's then requires Cookston to take specific steps to avoid termination and to submit an "action plan" indicating how he will cure the default.  ¶ 153.  Domino's will then follow up with one or more evaluation visits, as well as unannounced visits, to make sure the "condition" that caused the default was corrected.  Id.  Domino's may terminate a store's franchise agreement if Cookston does not cure a default.  In the event Domino's decides to terminate, Domino's has the exclusive option to take over the store at a pre-set purchase price.  Cookston would then be subjected to a non-compete provision.  ¶¶ 12, 134, 137.

In addition to OERs, Cookston must communicate with Domino's, on a near daily basis, about virtually every aspect of his stores, including personnel.  ¶ 139.  Area Leaders routinely visit Cookston stores unannounced, and report back having directly trained and supervised personnel.  ¶ 140.  In fact, Rudd once visited three Cookston stores on Long Island, and at each store, trained employees about pizza making techniques, even going so far as to order that certain pizzas be discarded and remade.  ¶ 151.  Rudd also concluded that "very little training" was taking place at one store.  Id.  Former Cookston Supervisor James Mumma also recalls Rudd speak directly with store employees, including about their uniforms not being clean.  ¶ 150.

As such, Domino's involvement and interactions with Cookston employees have gone far beyond mere "run-of-the-mill" supervision, providing an additional basis to conclude that the second Herman factor has been established, or that there are at least genuine issues of fact in dispute warranting a trial.  See, e.g., Herman, 172 F.3d at 140 (joint employment found despite

19

only "occasion[al] supervision); <u>Antenor</u>, 88 F.3d at 934-35 (joint employer conducted quality

control inspections and monitored employees' productivity); <u>Lopez</u>, 14 F.Supp. 2d at 421 (joint

employer engaged in frequent quality control inspections).

Furthermore, Domino's' direct handling of and/or substantial involvement in addressing

Cookston store customer and employee complaints is a further indicator of joint employment.

<u>See</u>, <u>e.g.</u>, <u>Irizarry</u>, 722 F.3d at 116 (that employer dealt with customer complaints "'only

occasionally' does not mean that these actions are irrelevant . . . especially when considered in

the context of his overall control of the company").  Cookston store customers and employees

can report complaints directly to Domino's Customer Care Center, and Domino's monitors the

adequacy and substance of his responses.  ¶¶ 46, 124.  For instance, after Domino's determined

that Cookston had not adequately responded to an employee complaint alleging that a store

manager was allowing family members to work at the store off-the-clock, Rudd sent Cookston

detailed instructions on how to investigate and address the complaint properly, and asked to be

copied on any correspondence with the manager in question.  ¶ 46.  On another occasion, after a

Cookston employee alleged that a manager was harassing her, Domino's provided Cookston

with a "security log" detailing the allegations, and instructed Cookston to investigate and report

his findings.  Cookston and O'Neill then visited the store, interviewed the manager and

employee, and sent a report to the Area Leader.  <u>Id.</u>  Another time, an Area Leader instructed

Cookston to investigate a complaint from a customer about being overcharged "very carefully"

to see if an employee added unauthorized tips, and told him that "charges should be pressed if []

confirmed."  ¶ 52.  On another instance, after O'Neill issued a written warning to an employee

accused of sending flirtatious messages to a customer, Ridge, seemingly not satisfied with

O'Neill's response, told Cookston that his "involvement in th[e] complaint is needed."  <u>Id.</u>

### 3.      Domino's' Role in the Determination of Rate and Method of Payment

The third <u>Herman</u> factor requires only evidence of "participation" in the payment of employees or that "some power" was exercised.  172 F.3d at 141 (putative employer "participate[d] in the method of payment" by ordering a stop to illegal pay practice).  <u>Torres-Lopez</u>, 111 F.3d at 643 (grower did not directly set workers' wages, but "exercised some power in determining the pay rates").  Here, there is a genuine dispute of fact as to Domino's' influence over Cookston employees' rates and methods of payments.



Second, Domino's requires Cookston to use PULSE, which Cookston uses as his timekeeping system in order to calculate wages.[10]  ¶¶ 71, 147.

Fourth, Domino's actions in promoting its anti-unionization position to Cookston,

creates genuine issues of fact on this prong as well, given that the presence of a union affects many vital aspects of employees' working conditions, including wages, schedules and benefits.

### 4.      Domino's' Maintenance of Employment Records

The record is rife with evidence creating genuine issues of fact as to the fourth <u>Herman</u> factor: the maintenance of employment records by Domino's.  <u>Herman</u>, 172 F.3d at 139;

---

[10]      Particularly relevant to this action in which Plaintiffs allege that they were not paid for all of their work hours is how PULSE permits time records (which Cookston uses for payroll purposes) to be adjusted, meaning an employee could have the hours in which they were "clocked in" and performed work artificially reduced.  <u>Id.</u>

[11]      Domino's has also provided guidance to Cookston about the content and structure of a form used to track delivery employee tips and owed reimbursements.  ¶ 71.

Barfield, 537 F.3d at 144 (joint employer's record of shifts worked by employees left "no question that [joint employer] maintained employment records" on matters most relevant to overtime obligations, "the hours worked").

There is no dispute that Domino's has unfettered access to the PULSE systems at each of Cookston's stores, which, by Cookston's own account, has to and does use as the system through which employment records were and are kept.  ¶ 85.  See Cordova v. SCCF, Inc., No. 13 Civ. 5665 (LTS)(HBP), 2014 WL 3512838, at *2 (discussing franchisor's alleged requirement of "certain record keeping systems, including systems for tracking hours and wages and for retaining payroll records"); Cano, 287 F.R.D. at 260 (weighing heavily fact that PULSE "included a system of tracking hours and wages and retaining payroll records.").  Cookston employees' names, addresses, driver's license information, wage rates, tips, hours worked and tasks performed are all entered into PULSE.  ¶ 85.  In addition, Domino's also requires and has unrestricted access to all Cookston records and information, including payroll, employment applications, I-9s, and criminal background and motor vehicle checks.  Id.  ███████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████

### C.      Evidence of Functional Control Under the Zheng Factors

The facts also establish, or at minimum raise genuine issues of fact as to, Domino's' joint employer status under the Zheng "functional control" factors.  See supra at fn. 7.[12]

Domino's' "premises and equipment" were and are used for employees' work (the first Zheng factor), in that Cookston is required to obtain Domino's approval of all store leases (¶ 88), and Cookston is required to purchase equipment (including PULSE hardware and software) from Domino's or an approved vendor (which Domino's has the option of taking over in the event of a termination at a non-negotiable, set price).  ¶¶ 12, 90

Cookston's business could not and did not shift to any other joint employer other than Domino's (the second Zheng factor).  Cookston had no ability to operate a pizza business for anyone but Domino's, as the SFA requires Cookston to devote his "full time and efforts" to manage his store, and he cannot engage in any other business without Domino's' consent.  ¶ 138.

Cookston's workers perform a job integral to Domino's' process of production (the third Zheng factor), consisting of providing food to customers through franchisee and corporate-owned stores, and these employees perform a discrete line-item job that is integral to Domino's' process.  In fact, as a pizza delivery company, Domino's could hardly argue that employees who make and deliver pizzas do not perform an integral task in their process of production.  See, e.g., Cordova, 2014 WL 3512838, at *5 (denying franchisor's motion to dismiss, finding that "because SCCF is a chain restaurant . . . their work within this model at Franchise Restaurants constitutes an 'essential step' in the production of the service for which SCCF is in business").

The responsibilities of Cookston's workers vis-à-vis Domino's would be materially the same if they worked for a different Domino's franchisee, or even a Domino's corporate store

---

[12]      No one Zheng factor is dispositive and not all factors need be present to establish joint employer.  Cordova, 2014 WL 3512838 (denying motion to dismiss by franchisor although plaintiffs conceded that first and forth Zheng factors weighed in franchisor's favor).

(fourth <u>Zheng</u> factor), as Domino's requires Cookston's employees and those working at all franchise stores to adhere to Domino's practices, policies and standards, including demanding attire, appearance, grooming and conduct standards.  <u>See</u>, <u>e.g.</u>, <u>Velez</u>, 2015 WL 75361 (fourth <u>Zheng</u> factor concerns whether plaintiffs are "tied to [a putative employer] rather than to an ostensible direct employer," and joint employment exists where "the <u>same</u> employees [c]ould continue to do the <u>same</u> work in the <u>same</u> place") (citing <u>Zheng</u>) (emphasis in original).

Evidence of the degree of supervision exercised by Domino's over Cookston employees (the fifth <u>Zheng</u> factor) has already been discussed (<u>supra</u> at § II(B)(2)), and is equally applicable to the <u>Zheng</u> analysis.

Finally, Cookston and his employees work "exclusively or predominantly" for Domino's (the sixth <u>Zheng</u> factor).  <u>Zheng</u>, 355 F.3d at 72.  Domino's requires Cookston and all other franchisees to work full time to manage their franchise, and prohibits ownership of any other business without Domino's' consent.  ¶ 138.  Cookston is thus principally dependent on Domino's for his livelihood, rendering Cookston employees similarly dependent on Domino's.  <u>See</u>, <u>e.g.</u>, <u>Lopez</u>, 14 F.Supp.2d at 421 (garment contractor "depended nearly entirely" on jobber for work, and "the [contractor's] workers were as much dependent on [the jobber]").

In sum, the record evidence demonstrates, or at the very least raises genuine disputed facts as to, Domino's' "functional control" as joint employer with the Cookston Defendants under the <u>Zheng</u> factors, and thus is jointly liable for the Cookston Defendants' violations under the FLSA and NYLL.[13]

---

[13]     Domino's asserts that to "[its] knowledge[], every court that has reached the merits of the 'joint employer' issue has concluded that the same controls Plaintiffs point to here do **not** transform a franchisor into a joint employer of its franchisees' employees."  Defs.' Mem. at 2. However, none of these cases were decided against the backdrop of the robust record of control by Domino's that the Court has before it.  Significantly, these decisions, most of which are outside of the Second Circuit, emphasize that their holdings were based on the lack of factual support that the legal claims being asserted.  <u>See</u> <u>Orozco v. Plackis</u>, 757 F.3d 445, 452 (5th Cir. 2014) ("We do not suggest that franchisors can never qualify as the FLSA employer for a franchisee's employees; rather, we hold that [plaintiff]

## III.    **THE FRANCHISOR DEFENDANTS ARE PLAINTIFFS' JOINT EMPLOYERS**

Defendants' assertion that Plaintiffs' claims against Domino's fail because Plaintiffs have

not attributed specific conduct to specific entities fails for several reasons.  First, Domino's

admits that Domino's Pizza, Inc. is the parent of Domino's Pizza LLC, and Domino's Pizza

Franchising, LLC.  Defs.' Mem. at 6.  Further, Ridge, the Vice President of Franchise Operations

for the past fourteen years, and who directly supervises Area Leaders, including those who

oversee each of Cookston's stores, is an employee of all three – Domino's Pizza Inc., Domino's

Pizza LLC, and Domino's Pizza Franchising, LLC.  ¶ 160.  ███████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

Furthermore, CEO David Brandon, who participated directly in the disciplining of multiple

Cookston employees, is identified as the "Principal Executive Officer" of Domino's Pizza, Inc.

in filings with the Securities and Exchanges Commission.  ¶ 162.  In addition, Domino's admits

that Domino's Pizza Franchising, LLC is a contracting party to each Cookston store's franchise

---

failed to produce legally sufficient evidence to satisfy the economic realities test and thus failed to prove that [defendant] was his employer[.]"); also Singh v. 7-Eleven, Inc., No. 05 Civ. 4534 (RMW), 2007 WL 715488 (N.D. Cal. Mar. 8, 2007) (franchisor not joint employer based on "economic reality" test and totality of circumstances, but language of franchise agreement "does not establish the nature of the employment relationship as a matter of law"); Chen v. Domino's Pizza, Inc., No. 09 Civ. 107, 2009 WL 3379946 (D.N.J. Oct. 16, 2009) (franchisor not joint employer where plaintiffs did not plead facts sufficient to show employment relationship, but only made conclusory statement that Domino's is employer "within the meaning of [the FLSA and New Jersey Labor Law]").  The other cases cited by Domino's similarly are limited to the sufficiency of the facts in the record.  See Gessele v. Jack in the Box, No. 15 Civ. 1092 (BR), 2016 WL 7223324, at *14 (D.Or. Dec. 13, 2016); Lovett v. SJCZ Fulton IND I, LLC, 2016 WL 4425363, at *18 (N.D.Ga. Aug. 22, 2016); Vann v. Massage Envy Franchising LLC, 2015 WL 74139, at *6 (S.D.Cal. Jan. 6, 2015); Courtland, 2013 WL 3894981, at *4; Reese v. Coastal Restoration & Cleaning Svcs., Inc., 2010 WL 5184841, at *5 (S.D.Miss. Dec. 15, 2010); Hatcher v. Augustus, 956 F.Supp. 387, 392 (E.D.N.Y. 1987); Donovan v. Breaker of Am., Inc., 566 F.Supp. 1016, 1019 (E.D.Ark. 1983).

Further, Patterson v. Domino's Pizza, 60 Cal. 4th 474 (2014) is distinguishable both on the law and the facts, as the court there found Domino's not liable under California law as an employer of a California franchise employee for a sexual harassment claim.  The case did not involve the FLSA or NYLL.  Moreover, the (4-3) decision was based on a limited factual record, and the Court gave undue deference to the terms of the franchise agreement, unlike cases under the FLSA and NYLL.  Patterson, 60 Cal. 4th at 503.  As such, Domino's' reliance on Patterson is misplaced.

agreement.  Defs.' Mem. at 6.  These facts are more than sufficient for Domino's, as an

integrated corporate entity, to be held liable as a joint employer with Cookston.

## CONCLUSION

For the foregoing reasons, the *Kucher* Plaintiffs respectfully request that the Domino's

Defendants' motion for summary judgment be denied in its entirety.

Dated: December 4, 2017
      New York, New York                Respectfully submitted,

                                              **WIGDOR LLP**

By: _____
                                    David E. Gottlieb
                                    Tanvir H. Rahman

                                    85 Fifth Avenue
                                    New York, NY 10003
                                    Telephone:  (212) 257-6800
                                    Facsimile:   (212) 257-6845
                                    dgottlieb@wigdorlaw.com
                                    trahman@wigdorlaw.com

                                    *Attorneys for Plaintiffs*