UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  [SEP 3 0 2018

---

In re DOMINO'S PIZZA INC.

OPINION AND ORDER

---

THIS DOCUMENT RELATES TO: All Actions

16-CV-2492 (AJN)(KNF)

---

ALISON J. NATHAN, District Judge:

This Opinion and Order concerns a common issue of law and fact in three consolidated

cases brought under the Fair Labor Standard Act ("FLSA") and the New York Labor Law

("NYLL"). Plaintiffs in all three cases are current and former employees of Domino's Pizza

franchises who bring claims against Domino's Pizza, Inc., Domino's Pizza LLC, and Domino's

Pizza Franchising LLC ("Domino's Defendants"), as well as against businesses and an

individual who operate Domino's Pizza franchises ("Cookston Defendants"). Before the Court

is the Domino's Defendants' motion for summary judgment with respect to all clams as against

them. In addition, the Domino's Defendants and the Cookston Defendants have moved to

enforce a Rule 68 Offer of Judgment, and the Domino's Defendants have moved to compel

arbitration of certain plaintiffs' claims. For the reasons stated below, the Domino's Defendants

motion for summary judgment is GRANTED, and the motions to enforce judgment and motion

to compel arbitration are DENIED.

I.      Background

   A. Procedural Background

      1. *Kucher*

Plaintiffs in *Kucher, et al. v. Domino's Pizza, Inc, et al.*, No. 16-cv-2492, filed a putative

class action on April 5, 2016 on behalf of themselves and other similarly situated employees of the Domino's franchises owned by the Cookston Defendants. The Third Amended Complaint, the operative complaint for purposes of the motions now before the Court, was filed on August 26, 2016. It alleges that the Domino's Defendants and the Cookston Defendants violated FLSA and NYLL by failing to compensate their employees in accordance with federal and New York state requirements. In addition, named plaintiff Riad Kucher alleges that Defendants retaliated against him by terminating his employment in response to his complaints about wage and hour violations.

On June 16, 2016, the Domino's Defendants moved to bifurcate proceedings to allow the Court to consider the issue of whether the Domino's Defendants can be held liable as a "joint employer" prior to consideration of the merits of the case. The Court granted this request on July 15, 2016, and the parties commenced limited discovery for the purposes of deciding the joint employer issue.

On July 27, 2016, the Cookston Defendants served an offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure on named plaintiffs Kucher and Haroon Majumder, as well as on opt-in plainitiff Amanul Islam Boby. The offer provided that the Cookston Defendants would pay each of the three plaintiffs $33,333,33 in exchange for their release from all claims asserted by the plaintiffs in the complaint. On August 10, 2016, Kucher, Majumder, and Boby accepted the offer of judgment in writing, and the Court subsequently entered the judgment. On November 27, 2017, Domino's Defendants filed a motion styled as a Motion to Enforce Rule 68 Offer of Judgment and to Compel Arbitration, which is now pending before the Court in *Kucher* only. Also pending in *Kucher* is the Cookston Defendants' November 27, 2017, Motion to Enforce Rule 68 Offer of Judgment.

### 2. *De Los Santos*

On August 8, 2016, former and current deliverymen employed by one of the Cookston-owned Domino's franchises filed a separate lawsuit, *De Los Santos, et al. v. Hat Trick Pizza, Inc., et al.*, No. 16-cv-6274, alleging various wage and hour violations against the Domino's Defendants and the Cookston Defendants. Plaintiffs in *De Los Santos* initially asserted collective and class action allegations, but after the Court conditionally certified the proposed collective in *Kucher* on February 13, 2017, the *De Los Santos* plaintiffs requested leave to amend to proceed individually. The Court granted their request to amend, and also granted the Domino's Defendants' request to consolidate proceedings as to the two cases as *In re Domino's Pizza Inc.* Discovery on the first stage of proceedings concluded on September 29, 2017. On October 31, 2017, Domino's Defendants filed the instant motion for summary judgment on the issue of joint employer liability. Plaintiffs filed an opposition on December 4, 2017, and the Domino's Defendants filed their reply on December 28, 2017.

### 3. *Gannon*

On January 20, 2018, the plaintiffs in *Gannon et al. v. Domino's Pizza Inc., et al.*, No. 18-cv-846, filed suit against the Domino's Defendants, Robert Cookston, and eight franchise stores owned and operated by Cookston. Their complaint states that the action was filed as a related action to *Kucher*, and brings almost identical claims alleging violations of FLSA and NYLL. On April 6, 2018, the parties stipulated to and the Court ordered the consolidation of *Gannon* with *Kucher* and *De Los Santos*.

Now before the Court is the motion for summary judgment on the issue of the Domino's Defendants' joint employer liability, which is common to all three consolidated actions.

### B. Factual Background

The following facts are undisputed except where specifically noted. Plaintiffs are current or former employees of one or more of the Cookston Defendants' Domino's franchises. 56.1 Statement ¶¶ 1-3. Defendant Domino's Pizza Inc. ("DPI") is a publicly traded company with its principle place of business in Ann Arbor, Michigan. *Id.* ¶ 4. Domino's Pizza LLC ("DPL") and Domino's Pizza Franchising LLC ("DPF") are indirect subsidiaries of DPI, and both have at some time granted Domino's Pizza franchises to approved entities. *Id.* ¶¶ 5, 6. As relevant to this proceeding, DPF has granted 32 franchises to corporate entities controlled or managed by Defendant Robert Cookston. *Id.* ¶¶ 8-9. These franchises were granted pursuant to a written franchise agreement, the Standard Franchise Agreement ("SFA"). *Id* ¶ 9. The SFA provides that each franchisee "shall be solely responsible for recruiting, hiring, training, scheduling for work, supervising and paying the persons who work in the Store and those persons shall be your employees, and not our agents or employees." *Id* ¶ 19. The Cookston Defendants possess their own business licenses and maintain their own bank accounts. *Id* ¶ 11. In exchange for the franchise rights, the Cookston Defendants pay an advertising fee and a royalty fee based on the gross sales of the store. *Id* ¶ 13.

In addition, DPF establishes standards for operation of Domino's franchises. *Id* ¶ 14. Though the parties dispute the characterization of these standards, they generally agree as to the substance of what is prescribed. The brand standards dictate "the type of ingredients franchisees must use in food products, temperatures at which those ingredients must be maintained, methods and equipment used to prepare various food products, and store cleanliness." *Id* ¶ 15. DPF also must approve franchise leases, *id* ¶ 88, and sets requirements for equipment purchased, *id.* ¶¶ 12, 90.

With respect to hiring, Cookston Defendants recruit applicants and conduct the hiring

process. *Id* ¶ 14. However, there are limitations on who they may hire: franchisees are prohibited from recruiting or hiring employees from a different Domino's franchise or corporate store. *Id* ¶ 21. The standards also require that the Cookston Defendants conduct criminal background checks and driver history checks on prospective hires using an approved vendor. *Id.* This information, as well as other information about employees, is entered into a proprietary software system called PULSE. This point-of-sale system, which records and tracks all revenue and expenses, is sold by Domino's. *Id.* ¶ 47. PULSE is also used in Cookston franchises to track employee hours; Cookston defendants can set shifts for individual employees, and then employees use the system to clock in and out. *Id.* ¶ 43. Store hours of operations, on the other hand, are mandated by Domino's, as well as holidays on which the stores can be closed. *Id.* Although stores can request a variance from the standard hours, there is no evidence that the any of the Cookston franchises ever did so. *Id.* Franchise stores are also required to staff at least two employees at all times. *Id.* Each franchise owner determines the wages paid to employees, as well as the price of products, except for national promotions. Nevertheless, employees of the Domino's Defendants have provided guidance about wage and labor law issues. *Id.* ¶¶ 71, 147.

In order to enforce its brand standards, Domino's Defendants conduct audits and inspections of the franchises ("OERs"). *Id.* ¶ 66. Stores receive a score evaluating their compliance with brand standards. *Id.* ¶ 144. If they receive a low score, the store may be placed in default. *Id.* ¶ 144. In addition to these formal inspections, Robert Cookston and Cookston store managers communicate with DPF employees about a variety of business issues, including following up on problems observed during OERs and, on at least several occasions, issues with specific Cookston store employees or managers. *Id.* ¶¶ 46. Domino's also maintains a Customer Care Center, which received complaints from customers and, occasionally, from employees. ¶¶

46, 124. These complaints are forwarded to the individual franchises for a response, and Domino's monitors to ensure customer complaints have been addressed. *Id.* ¶ 52.

The record also contains several accounts of specific instances in which an employee or manager of the Domino's Defendants was somehow involved in disciplinary actions. First, in 2009, former Domino's CEO David Brandon was dissatisfied with a pizza prepared by a Cookston franchise employee for Brandon's appearance on Fox Business News. Cookston was contacted by several Domino's Defendant executives, told that something "had to be done," and received a notice of default about the store in question instructing him to provide "written proof of any disciplinary action that you will take with the employees involved in this incident as you deem necessary." *Id.* ¶ 53. The employee who prepared the pizza was suspended and demoted. *Id.* In addition, emails between Domino's Defendants' employees and Cookston Defendants reveal several instances of Domino's Defendants offering advice about disciplinary measures. *Id.* ¶ 28. Finally, a former manager of several Cookston franchises stated[1] that Domino's Defendants' employees informed franchisees on at least two occasions when they wanted franchise employees "held accountable" for issues that came up during inspections, after which employees were fired. *Id.*

## II. Legal Standard

A court may not grant a motion for summary judgment unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is

---

[1] The Domino's Defendants ask the Court to discount James Mumma's declaration as hearsay and because he was not identified as a potential witness pursuant to Rule 26 of the Federal Rules of Civil Procedure. Though Mumma's Declaration does contain statements about what he "was told," the declarants in those instances are employees or managers of the Cookston Defendants or the Domino's Defendants, and therefore these statements may be admissible as statements of a party opponent. *See* Gottlieb Decl., Ex. 19. However, the Court need not decide the issue, because even assuming arguendo that all of Mumma's testimony would be admissible at trial, the outcome of this motion would not be affected.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Summary judgment is appropriate when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Smith v. County of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[I]n making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In seeking summary judgment, the initial "burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). If the non-moving party would bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant "demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact"

to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting *Celotex Corp.*, 477 U.S. at 323).

## III.  Discussion

### A.  Joint Employer Analysis

The question before the Court is whether the Domino's Defendants can be held liable as "joint employers" for the wage and hour violation claims brought by Plaintiffs. To be held liable under FLSA or NYLL, an entity or an individual must be an "employer." *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). Because the definition of employer under FLSA and NYLL is generally considered co-extensive, courts employ a single test to determine whether an individual qualifies as an employer under either. *See, e.g.*, *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n. 13 (S.D.N.Y. 2010).

FLSA defines an "employer" broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). In assessing whether a putative employer meets this definition, the "overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." *Herman*, 172 F.3d at 139 (citations omitted). "[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.' " *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). The Second Circuit has identified two sets of factors relevant to this analysis: one to assess formal control, and the second to assess functional control. *See Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1084) (formal control factors); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003) (functional control factors). These

factors are not exclusive, and the two sets may have differing applicability "based on the factual challenges posed by particular cases." *Barfield*, 537 F.3d at 142.

Though the Second Circuit has not yet applied the joint employer factor test to determine whether a franchisor can be held liable as a joint employer, other courts have concluded that the type of standard setting and oversight exercised by a franchisor does not rise to the requisite level of control to constitute joint employer status. *See Patterson v. Domino's Pizza, LLC*, 333 P.3d 723, 726 (Cal. 2014) ("It is the franchisee who implements the operational standards on a day-to-day basis, hires and fires store employees, and regulates workplace behavior."); *In re Jimmy John's Overtime Litigation*, No. 14 C 5509, 2018 WL 3231273 at *20 (N.D. Ill. June 14, 2018) ("Jimmy John's control over the systems, operations, and dress code at franchise stores, as pervasive as it may seem, does not amount to joint employment."); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690 n. 6 (D. Md. 2010) ("Courts evaluating franchise relationship[s] for joint employment have routinely concluded that a franchisor's expansive control over a franchisee does not create a joint employment relationship."); *Chen v. Domino's Pizza, Inc.*, No. 09-107, 2009 WL 3379946, at * 3 (D.N.J. Oct. 16, 2009) ("Courts have consistently held that the franchisor/franchisee relationship does not create an employment relationship between a franchisor and a franchisee's employees."). Indeed, Plaintiffs were unable to point to a single case in which a franchisor was held liable as a joint employer under FLSA. *But see Orozco v. Plackis*, 757 F.3d 445, 452 (5th Cir. 2014) ("We do not suggest that franchisors can never qualify as the FLSA employer for a franchisee's employees."); *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012) (granting motion to amend FLSA complaint to add Domino's franchisor defendants, in part based on allegations that franchisors "promulgated compensation policies and implemented them through Domino's PULSE system"); *Cordova v. SCCF, Inc.*,

2014 WL 3512838 (S.D.N.Y. 2014) (denying a motion to dismiss by franchisor defendants because plaintiffs had plausibly pleaded facts "suggestive of joint employment").

The persuasive weight of this precedent notwithstanding, careful analysis of the two sets of factors in light of the evidence in the record is required to determine whether the Domino's Defendants are joint employers for purposes of FLSA liability. In this case, for the reasons provided below, the Court concludes that there is no genuine issue of material fact: the Domino's Defendants exercised neither formal nor functional control over Plaintiffs, and therefore do not qualify as Plaintiffs' employers.[2]

### 1. Formal Control Factors

To determine whether an entity exercised formal control over putative employees, courts consider "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013) (quoting *Carter*, 735 F.2d 8 at 12). A positive finding "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 939 (S.D.N.Y. 2013) (internal quotation marks omitted). "Indeed, control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." *Ocampo v. 455 Hospitality LLC*, No. 14-CV-9614, 2016 WL 4926204, at *6 (S.D.N.Y. 2016) (quoting *Hart*, 967 F. Supp. 2d at 939) (internal quotation marks omitted). The Court will begin its inquiry by addressing each of the formal control factors in

---

[2] Because the Court concludes that the record does not support a finding that the Domino's Defendants exercised the requisite level of control to meet the definition of employer even if considered together as one entity, the Court need not reach the issue of whether the three defendants constitute a single integrated enterprise.

turn.

### i. Power to Hire and Fire

With respect to the first factor, the parties agree that the Domino's Defendants do not receive applications, interview potential employees, or otherwise directly hire employees to work at the Cookson Defendants' franchise stores. Indeed, none of the Plaintiffs in the case contend that the Domino's Defendants were involved in their hiring. Plaintiffs do, however, point to substantial evidence in the record regarding various ways in which the Domino's Defendants policies may affect franchise hiring decisions. Specifically, they assert that the Domino's Defendants may exercise control over hiring by requiring Cookston Defendants to run criminal background checks with an approved vendor, and by limiting eligible candidates to those who pass background checks and those who do not work at another Domino's franchise. However, the decision as to which qualified applicants to hire is squarely within the Cookston Defendants's authority. *See Godlewska v. HDA*, 916 F. Supp. 2d 246, 254 (E.D.N.Y. 2013) (holding that the power to hire rests with the entity that chooses who to hire, even if another entity "dictates the minimum criteria for persons who fill these positions and reviews applicants' resumes to ensure the applicants are qualified"); *Jean-Louis v. Metro. Cable Communications, Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011) (finding no power to hire despite putative third party employer's requiring direct employer to perform background checks). Without more, evidence of corporate guidance in the hiring process is insufficient to demonstrate that a franchisor has power to hire a franchisee's employees. *See In re JimmyJohn's*, 2018 WL 3231273, at *15 (finding no power to hire when franchisor did not directly hire employees but provided interview forms, instructed franchisees to hire additional staff, and implemented restrictions on who could be hired); *see also Patterson*, 333 P.3d at 728 (finding no power to hire when the record was clear that Domino's

did not receive applications nor participate in interviews). The Court reaches the same conclusion here.[3]

Similarly, there is no evidence before the Court that the Domino's Defendants had the power to fire Cookston employees, and little evidence that they had authority to take disciplinary actions. Notably, Plaintiffs point to no instance in which the Domino's Defendants fired a Cookston franchise employee, nor do they suggest that they had the authority to do so independently. The evidence in the record, viewed in the light most favorable to the Plaintiffs, does reveal at least a handful of circumstances since 2009 in which Dominos' Defendants may have influenced disciplinary decisions. For example, on at least several occasions, Domino's Defendants contacted Cookston managers to request or verify that some disciplinary measure was carried out. Cookston Defendants also appear to have kept Domino's Defendants apprised of employment actions about which they had sought advice, particularly if the action was taken in response to a poor performance score. However, the evidence also makes clear that the Cookston Defendants alone carried out any disciplinary actions. *See Zampos v. W & E Communications, Inc.*, 970 F. Supp. 2d 794, 803 (N.D. Ill. 2013) (finding that the putative joint employer did not exercise the control of employees despite "making recommendations to de-badge" direct employer's technicians). Given these facts, there is no genuine dispute that the Domino's Defendants did not "ha[ve] the power to hire and fire the employees." *Irizarry*, 722 F.3d 99 at 105.

### ii. Supervision and Control of Scheduling or Conditions of Employment

---

[3] The two specific examples Plaintitffs cite to as evidence of the Domino's Defendants playing a role in hiring do not alter this analysis because neither suggests that the Domino's Defendants had any sort of authority to hire employees themselves. *See* Pl. Ex. 16 (referring to a "campaign to hire drivers" initiated by a Cookston store manager in response to an OER); *Id.* Ex. 17 (stating Domino's Defendant's opinion that a Cookston employee "is a good manager just young").

As to the second factor, though many of the standards set by the Domino's Defendants impact Plaintiffs' work, the record does not support the proposition that Domino's Defendants controlled Plaintiffs' work schedules, and is at best ambiguous as to whether the Domino's Defendants supervised Plaintiffs. Plaintiffs argue that though the Domino's Defendants did not set the work schedules or shifts of individual employees, they nevertheless exercised control over scheduling by dictating store opening hours and minimum staffing requirements. Pl. Opp. at 15. However, courts in this circuit have held that this type of control is insufficient to meet the second factor. *See e.g.*, *Jean-Louis*, 838 F. Supp. 2d at 125-26 (Plaintiff's argument that putative joint employer controlled scheduling when it set time windows in which employees had to perform services "ignores the difference between affecting and supervising or controlling."); *Godlewska*, 916 F. Supp. 2d at 259 ("Simply determining when a certain job will be performed is not tantamount to determining which employee will perform that job at a particular time."); *Mao v. Sands Bethworks Gaming LLC*, No. 15-CV-6252, 2016 WL 1717220, at *3 (S.D.N.Y. Apr. 28, 2016) (finding that control over bus schedules "is not the sort of control over employee work schedules or conditions of employment that suffices to establish an employer-employee relationship."). There is no doubt based on the evidence that the Cookston Defendants, and not the Domino's Defendants, determine which employees will take which shift, and thus Plaintiffs have not pointed to the existence of a dispute of fact as to whether the Domino's Defendants control Plaintiffs' schedules.

Plaintiffs also argue that the Domino's Defendants supervise franchisee working conditions by monitoring compliance with standards, including standards for staffing and hours. Pl. Opp. at 16-17. But "[q]uality control and compliance-monitoring that stem from the nature of the business—that is, from the nature of the goods or services being delivered—are qualitatively

13

different from control that stems from the nature of the relationship between the employees and the putative employer." *Godlewska*, 916 F. Supp. 2d at 260 (quoting *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 691-92 (D.Md. 2010) (internal quotation marks and alteration omitted)). It is Plaintiffs' view, however, that Domino's standards "go beyond merely ensuring product and service consistency and quality, and brand protection." Pl. Opp. at 17. By conducting regular inspections and on-site visits, and by addressing customer complaints, Domino's Defendants actively supervise the working conditions at their franchises, Plaintiffs argue. *Id.* There is certainly evidence in the record to support the fact that the Domino's Defendants conduct regular inspections of franchise locations, are in regular communications with franchise managers concerning various aspects of business operations, and follow up on customer complaints received through the Customer Care Center. Dominos' Defendants, who can place a store in default and terminate the franchise agreement if a default is not cured, exert significant influence on franchise owners. However, "the fact that [a franchisor] would have to resort to economic and business relationship sanctions to motivate [a franchisee] to implement service changes underscores its lack of direct authority or control." *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1236 (N.D. Ca. 2015) ("[I]t is clear that McDonald's has the ability to exert considerable pressure on its franchisees…[b]ut the evidentiary showing about McDonald's strength as a franchisor do nothing to negate or call into question the dispositive fact that the authority to make hiring, firing, wage, and staffing decisions at the [franchise] restaurants lies in [the franchisee] and its managers—and in them alone."). The Court concludes that the type of supervision evidenced in the records does not demonstrate that the Domino's Defendants controlled conditions of employment at the Cookston franchises.

### iii. Determination of Rate and Method of Payment

The third factor weighs against a finding of formal control. There is no genuine dispute that the Cookston Defendants, and not the Domino's Defendants, determine the rate and method of payment of employees at the franchise stores. Plaintiffs' arguments to the contrary are unconvincing; they do not support the proposition that the Domino's Defendants either set Plaintiffs' wage rates or issued payments. *See Jean-Louis*, 838 F. Supp. 2d at 129-30 ("[T]he test is whether a putative joint employer determines pay rates, not whether it affects them."); *Herman*, 172 F.3d at 140 (finding the factor met where a putative joint employer "had authority to sign paychecks throughout the relevant period").

### iv. Maintenance of Employment Records

Finally, the record does not support a finding that the Domino's Defendants "maintain" employment records. Plaintiffs assert that there are "genuine issues of fact" as to whether the Domino's Defendants maintain such records. Contrary to this assertion, the parties agree on Plaintiffs' primary allegation—that the Domino's Defendants have access to the PULSE system records of the Cookston franchises and that the employment records were subject to audit. However, the ability to access records is not the relevant inquiry. *See Irizarry*, 722 F.3d at 116 (finding that access to employment records does not meet the fourth factor). In light of the Domino's Defendants' policies regarding, *inter alia*, background checks, access to and review of records kept by the Cookston Defendants is "only an extension" of quality control procedures. *Godlewska*, 916 F. Supp. 2d at 262.

Plaintiffs also point to the "records of employee complaints" that Domino's Defendants keep when the complaints come in through the Customer Care line. These limited records, which are the only records collected and stored by the Domino's Defendants rather than by the Cookston Defendants, are not sufficient to find the fourth *Carter* factor met. *See Vasto v.*

*Credico (USA) LLC*, No. 15 Civ. 9298, 2017 WL 4877424 at *12 (S.D.N.Y. Oct. 27, 2017)

(finding that the fourth factor did not favor joint employer status even where a putative joint

employer kept a database of contact information and sales records but no records of hours

worked); *see also Jean-Louis*, 838 F. Supp. 2d at 130 ("[T]his is not a case where a putative joint

employer signs off on time sheets completed by each plaintiff, verifies the number of hours

worked by each plaintiff and then provides records of the hours worked to the plaintiff's

contractor employer who uses the records to compensate the plaintiff on a per-hour basis.")

(quoting *Barfield*, 537 F.3d at 136) (internal quotation marks omitted).

Drawing all factual inferences in favor of the Plaintiffs, there is nevertheless insufficient

evidence in the record for a reasonable juror to conclude that the Domino's Defendants exercised

formal control over Plaintiffs in this case. *See Godlewska*, 916 F. Supp. 2d at 262 (finding that

defendants did not exercise formal control despite "the record's inconclusiveness as to the third

*Carter* factor" where the other three factors were not met).

### 2. Functional Control Factors

Even if an alleged employer did not exercise formal control, it may nevertheless exercise

sufficient "functional control" over a worker's environment to meet the FLSA definition of an

employer. *Zheng*, 355 F.3d at 71. Courts consider the following factors in evaluating functional

control: "(1) whether the alleged employers' premises and equipment were used for the plaintiffs'

work; (2) whether the subcontractors had a business that could or did shift as a unit from one

putative joint employer to another; (3) the extent to which [the] plaintiffs performed a discrete

line job that was integral to the alleged employers' process of production; (4) whether

responsibility under the contracts could pass from one subcontractor to another without material

changes; (5) the degree to which the alleged employers or their agents supervised [the] plaintiffs'

work; and (6) whether [the] plaintiffs worked exclusively or predominantly for the alleged employers." *Olvera v. Bareburger Group LLC*, 73 F. Supp. 3d 201, 205-06 (S.D.N.Y. 2014) (alterations and internal quotation marks omitted) (quoting *Zheng*, 355 F.3d at 72).

With respect to the first factor, the parties agree that the Cookston Defendants lease the premises of the franchise stores and purchase the equipment used by employees in those stores. Plaintiffs argue that the requirement that the Cookston Defendants secure approval of all leases and purchase equipment only from Domino's or an approved vendor supports the implication that Domino's "premises and equipment were and are used for employees' work." Pl. Opp. at 23. However, the relevant criterion is "ownership or control of the premises of employment." *Carillo v. Schneider Logistics Trans-Loading*, No. 2:11-cv-8557, 2014 WL 1155403, at * (C.D. Ca. Jan. 14, 2014). By approving the lease and setting standards for equipment purchases, the Domino's Defendants do not assume ownership or control of the premises, which were purchased by the Cookston Defendants and remain in the Cookston Defendants' control.

The fourth factor also undermines the proposition that the Domino's Defendants exercised functional control over Plaintiffs. In their opposition, Plaintiffs point out that the Cookston franchise employees, who are required to adhere to "demanding attire, appearance, grooming, and conduct standards," "would be materially the same if they worked for a different Domino's franchisee, or even a Domino's corporate store." Pl. Opp. at 23. However, this misstates the factor, which "asks not whether all of the putative joint employer's contractors do the same work but whether, if the putative joint employer hired one contractor rather than another, the *same* employees would continue to do the *same* work in the *same* place." *Jean-Louis*, 838 F. Supp. 2d at 135 (emphasis original) (quoting *Zheng*, 355 at 74 n. 11). Plaintiffs could certainly perform the same or very similar tasks if they worked for a different Domino's

franchise, but they would have no guarantee of being hired, and their salaries, supervisors, and places of work would differ even if successful. *See Cordova*, 2014 WL 3512838, at *5 (finding that fourth factor weighed in Defendants' favor where Plaintiffs "do not allege that they could have maintained a relationship with [the franchisor] were they not employed by their direct employers").

The fifth factor overlaps substantially with the analysis of supervision for purposes of formal control. *Zheng* cautions that even "extensive supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." 355 F. 3d at 74. As discussed above, the Court concludes that the Domino's Defendants' standard-setting and enforcement through audits and inspections, though extensive, do not constitute control of the terms of Plaintiffs' employment. *See Hugee v. SJC group, Inc.*, No. 13 Civ. 0423, 2013 WL 4399226, at *5-6 (S.D.N.Y. Aug. 14, 2013) (holding that supervision for purposes of quality control does not support a finding of joint employer status).

The second, third, and sixth factors are difficult to translate to the franchisee-franchisor context. The second factor requires the Court to consider whether Plaintiffs had a business that could or did shift as a unit from one putative joint employer to another. Plaintiffs argue that Cookston operated a pizza business for Domino's, and "could not and did not shift to any other joint employer" because the SFA requires that he devote his "full time and efforts" to Domino's store management. Pl. Opp. at 23. Defendants, on the other hand, state that Cookston's franchise employees do not "perform services of any kind for the Domino's Defendants." Def. Mem. at 22. The difference between these two views boils down to a disagreement about whether the franchise stores were operated *for* Domino's. Though it is certainly true that the Domino's Defendants ultimately profit from the work of Plaintiffs through royalty payments, the

true recipients of the services performed by Plaintiffs' are the store customers. Importantly, the amount of pizza Plaintiffs' produce and sell is unconnected to any request or demand from the Domino's Defendants.

The third factor is similarly malapropos, asking the Court to assess the extent to which Plaintiffs performed "a discrete line job that was integral to the alleged employers' process of production." The Domino's Defendants' business model is not easily analogized to an entity with a "process of production." *See Jean-Louis*, 838 F. Supp. 2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product."). Thus, the Court does not give much weight to the second and third factors.

Nor is the sixth factor, whether Plaintiffs performed work exclusively or predominantly for the Domino's Defendants, particularly helpful to Plaintiffs' case. First, it is unclear whether employees of a franchisee that pays royalties to the franchisor are performing "work" for the franchisor because their services are not compensated by the franchisor. *Cf. Zheng*, 355 F.3d at 75 (noting the concern that employees may become economically dependent on a joint employer who contracts for all or nearly all of their services). Even if the Court could conclude that the Domino's Defendants are functionally Plaintiffs' client for purposes of this factor, as the Second Circuit held in *Zheng*, working primarily or solely for one client is not a proxy for joint employment because it is "perfectly consistent with a legitimate subcontracting relationship." *Zheng*, 355 F.3d at 72. Instead, the lack of a broad client base is "a starting point in uncovering the economic realities of a business relationship." *Id.* The franchise model is entirely inconsistent with a franchisee store having multiple "client" franchise companies in whose name they do business, but this is not unique to the business relationship between the Defendants in

this case. It is instead a feature of the franchise system. Therefore, the sixth *Zheng* factor does not support a finding that the Domino's Defendants are joint employers. *See id.* at 76 (stating that the economic reality test "is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA").

Of course, the *Carter* and *Zheng* factors do not establish "rigid rules" for determining a putative employer's status. *Barfield*, 537 F.3d at 143. A court is "free to consider any other factors it deems relevant to its assessment" of the totality of the circumstances in a particular work context. *Zheng*, 355 F.3d at 71-72. However, even drawing all factual inferences in favor of Plaintiffs, the record indicates that the Domino's Defendants exercised only the oversight typical of a franchisor, whose success depends on "build[ing] and keep[ing] customer trust by ensuring consistency and uniformity in the quality of goods and services, the dress of franchise employees, and the design of the stores themselves." *Patterson*, 333 P.3d at 733.

Based on its analysis of the formal and functional control factors, the Court concludes that the Domino's Defendants are not joint employers as a matter of law. *See Zheng*, 355 F. 3d at 76-77 (noting that judgment as a matter of law may be appropriate even if the Court decides that not every factors weighs against joint employment).

## B. Ostensible Agency

In their opposition to the Domino's Defendants' Motion for Summary Judgment, Plaintiffs argue that the Domino's Defendants could also be held liable under a theory of ostensible agency, as applied in the franchisor-franchisee context. The doctrine of ostensible or apparent agency allows a third party to recover from a principal where "(1) the person dealing with the agent does so with the reasonable belief in the agent's authority; (2) that belief is generated by some act or neglect of the principal sought to be charged, and (3) the replying party

is not negligent." *Ochoa*, 133 F. Supp. 3d at 1239 (internal quotation marks omitted). Plaintiffs argue that there are at a minimum questions of fact as to whether they reasonably believed that they were employed by Domino's and whether Domino's was negligent in failing to take action to correct that misperception. Pl. Opp. at 2-8.

The Court notes that Plaintiffs point to no cases in which entities or individuals were held liable under FLSA or the NYLL based on a theory of ostensible agency when a court has found that they are not "employers" as those statutes and caselaw resulting therefrom define the term. The cases they do cite support the proposition that the ostensible agency theory is applicable in the tort and contract contexts and where a statute specifically anticipates liability for the actions of agents. *See Ochoa*, 133 F. Supp. 3d at 1239 (holding that an ostensible agency theory may allow recovery against a franchisor under a California statute that defines employment to include "directly or indirectly, *or through an agent* or any other person…exercise[ing] control over wages, hours, or working conditions of any person") (emphasis original); *Stern v. Starwood Hotels & Resorts Worldwide, Inc.*, 52 N.Y.S.3d 58, 59 (N.Y. App. Div. 2017) (holding that apparent or ostensible agency theory may allow recovery against a franchisor for torts); *Butler v. McDonald's Corp.*, 110 F. Supp. 2d 62, 68 (D.R.I. 2000) (same); *Hmied v. Timpano Acquisition, LLC*, No. 6:13 Civ. 1002, 2014 WL 1293362, at *6 (M.D. Fla. Mar 28, 2014) (noting that apparent agency doctrine may apply when determining if a non-signatory to a contract can compel arbitration); *Courtland v. GCEP-Surprise, LLC*, No. 12 Civ. 00349, 2013 WL 3894981, at *9 (conducting apparent agency analysis to assess possibility of recovery against a franchisor for employment discrimination under Title VII, which defines "employer" to include agents); *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 157 (4th Cir. 1988) (holding that franchisor liability for personal injuries may be premised on an apparent agency theory ).

On the other hand, the definition of "employer" in FLSA is to be broadly construed. *See*

*Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 188-89 (S.D.N.Y. 2003).

Indeed, the Supreme Court has observed that FLSA's definition is "comprehensive enough to

require its application to many persons and working relationships, which prior to this Act, were

not deemed to fall within an employer-employee category." *Rutherford Food Corp. v. McComb*,

331 U.S. 722, 729 (1947). However, even if the Court were to hold that ostensible agency

doctrine is applicable in this statutory context, it would not aid Plaintiffs in this case. Though

Plaintiffs state in their opposition papers that they reasonably believed that they were employed

by Domino's due to Domino's negligence, this allegation is nowhere in their Complaints.

Moreover, the Complaints do not refer to Cookston as an "agent" of Domino's or otherwise put

the Domino's Defendants on notice that they intended to "press[] an apparent agency theory of

liability." *Pope v. Espeseth, Inc.*, 228 F. Supp. 3d 884, 887 (W.D. Wisc. 2017) (denying leave to

amend to add apparent employer theory of liability against franchisor in wage and hour

complaint).

For the reasons already discussed, the Court concludes that the Domino's Defendants are

not joint employers for purposes of liability under FLSA or the NYLL, nor can they recover

under an ostensible agency theory. Accordingly, the Court grants summary judgment in favor of

the Domino's Defendants.

### C. Rule 68 Offer of Judgment

The Court turns next to the pending Motions to Enforce Rule 68 Offer of Judgment and

the Motion to Compel Arbitration in *Kucher*. The Cookston Defendants ask the Court to enforce

the Rule 68 Offer of Judgment previously accepted by three plaintiffs who nevertheless remain

active in the litigation. The Domino's Defendants request the same relief, and also ask the Court

to compel arbitration of claims brought by plaintiffs who signed arbitration agreements with Domino's when employed at corporate-owned Domino's stores.

Because the parties do not dispute that the Rule 68 Offer was accepted by Plaintiffs Kucher, Mojumdar, and Boby and is enforceable to release their claims as to the Cookston Defendants, the Court believes that the issues at stake in the three motions are likely mooted by the entry of summary judgment in favor of the Domino's Defendants pursuant to this Opinion and Order. Accordingly, the Court denies the motions to enforce the Rule 68 judgment and the Domino's Defendants motion to compel arbitration, but grants the parties leave to refile within two weeks of the date of this Order in the event that there are unresolved issues that remain with regard to the Rule 68 judgment.

## IV.    Conclusion

For the foregoing reasons, the Domino's Defendants' motion for summary judgment in this consolidated action is GRANTED. In addition, the Cookston Defendants' Motion to Enforce Rule 68 Offer of Judgment and the Domino's Defendants' Motion to Enforce Rule 68 Offer of Judgment and to Compel Arbitration in *Kucher* are DENIED, with leave to refile no later than two weeks from the date of this Order. This resolves Docket Nos. 432, 457 and 460, and Docket No. 135 in the member case 16-cv-6274. The Clerk of the Court is respectfully requested to terminate the cases as to the Domino's Defendants.

In addition, the parties in the three member cases shall each file a letter by no later than October 15, 2018 providing the Court with their views as to whether the cases should remain consolidated.

SO ORDERED.

Dated: September **30**, 2018

New York, New York

ALISON J. NATHAN
United States District Judge